1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


DARLA ELLIS,                    :    CIVIL ACTION - LAW
                                :
        Plaintiff               :
                                :
    VS                          :
                                :
HARRISBURG AREA COMMUNITY       :
COLLEGE, THOMAS DICK,           :
individually and in his         :
capacity as Director of         :
Student Account and             :
Cashiering for Harrisburg       :
Area Community College;         :
MEREDITH TULLI,                 :
individually and in her         :
capacity as Human Resources:
Director for Harrisburg         :
Area Community College; and:
BARBARA L. HUTCHINSON,          :
individually and in her         :
capacity as Controller for :
Harrisburg Area Community       :
College,                        :
                                :
        Defendants              :    NO: 1:05-CV-02466-YK
: : : : : : : : : : : : : : : : : : : : : : : : :


            Oral deposition of DARLA ELLIS
    taken pursuant to notice at the Law
    Offices of Archer & Archer, P.C.,
    located at 2515 North Front Street,
    Harrisburg, Pennsylvania, on September 29,
    2006, before Suzanne Minello-Devine,
    Court Reporter and Notary Public,
    there being present.




                SUZANNE MINELLO COURT REPORTING
                    573 INDIAN RUN DRIVE
                HUMMELSTOWN, PA  17036
                    (717) 671-7007

```
For Defendant:        Marshall, Dennehey, Warner
                      Coleman & Goggin
                      Sharon O'Donnell, Esquire
                      4200 Crums Mill Road
                      Harrisburg, PA  17112

For the Plaintiff:    Archer & Archer
                      Thomas Archer, Esquire
                      2515 North Front Street
                      Harrisburg, PA 17110
```

WITNESS
D. Ellis
        Examination by Ms. O'Donnell    3

                *    *    *    *    *    *

                        E X H I B I T S
Exhibit No.                Description              Marked
    26                Interview Schedule              126
    27                Interview Schedule              126
    28 & 29           Resume                          126
    30                10/15/03 Letter                 126
    31                6/16/03 Salary Letter           126
    32                4/26/02 Salary Letter           126
    33                5/10/01 Salary Letter           126
    34                5/15/00 Salary Letter           126
    35                5/20/99 Letter                  126
    36                7/17/98 Recommendation          126
    37                Resume                          126
    38                Administrative Procedure        126
    39                Administrative Procedure        126
    40                Resume                          126
    41                Tax Form                        126
    42                5/21/03  Letter                 126
    43                3/11/03 Office Procedure         126
    44                9/18/02 e-mail                  126
    45                11/11/02 e-mail                 126
    46                7/9/03 e-mail                   126
    47                12/19/02 e-mail                 126
    48                12/13/02 e-mail                 126
    49                12/18/02 e-mail                 126
    50                Minority Caucus Letter          126
    51                MC Meeting e-mail               126
    52                10/3/02 e-mail                  126
    53                10/18/02 e-mail                 126
    54                8/23/02 e-mail                  126
    55                e-mail                          126

3

1          (It was stipulated by and among
2    counsel for the respective parties that
3    reading, signing, sealing, certification
4    and filing are waived, and that all
5    objections, except as to the form of the
6    question, are reserved to the time of
7    trial.)
8
9          - - -
10   ...DARLA ELLIS, having been duly
11   sworn as a witness, was examined and
12   testified as follows...
13         - - -
14
15         EXAMINATION
16 BY MS. O'DONNELL:
17   Q.    Good morning, Ms. Ellis.  I'm Sharon
18 O'Donnell, as you probably know, and I represent all
19 of the Defendants in this lawsuit.  You have been
20 present for most, if not all, of the depositions
21 taken so far in this case.
22   A.    Right.
23   Q.    Notwithstanding the fact that you've
24 probably heard these instructions each and every time
25 a deposition has been taken, but for the sake of

4

1 completeness I'm going to repeat those instructions
2 for you today.
3   A.    Okay.
4   Q.    First and foremost, your answers must
5 be audible and verbal.  As you're doing now, you must
6 refrain from nodding your head, shaking your head, or
7 otherwise gesturing in response to a question and
8 that is because our court reporter is taking down
9 everything that we say.  Your testimony and my
10 questions will be ultimately transcribed into a
11 booklet form and will be used later on during the
12 lawsuit and some of the proceedings.  Do you
13 understand that?
14   A.    Yes, I do.
15   Q.    In addition to keeping your answers
16 audible and verbal, I'm going to instruct you not to
17 answer a question that you don't understand.  If I
18 ask a question that is awkwardly phrased, please,
19 don't answer it.  Ask me to rephrase or repeat it if
20 you don't hear it because I'm interested in obtaining
21 from you truthful and factual information to the best
22 of your knowledge.  I don't want you to speculate.  I
23 don't want your personal opinion.  I don't want you
24 to guess or make inferences.  Give me information
25 from your direct and personal knowledge.  Okay?

5

1   A.    Okay.
2   Q.    If you give me an answer to a question
3 that you don't understand, I'm going to assume that
4 you both heard it and understood it and that the
5 answer that you give me is the answer that you mean
6 to give me.  Okay?
7   A.    All right.
8   Q.    For any reason if you need to take a
9 break to either consult with your attorney, in any
10 situation other than when a question is pending, to
11 use the facilities, to get a drink, to take a walk,
12 or anything, just let me know and I'll accommodate
13 that request.  Okay?
14   A.    All right.
15   Q.    Is there any reason today why you don't
16 believe you can give me truthful and accurate
17 testimony?
18   A.    No.
19   Q.    Do you have any questions for me in
20 terms of the way that this process is going to occur?
21   A.    No, I do not.
22   Q.    Will you, please, state your name for
23 the record.
24   A.    My name is Darla Ellis.
25   Q.    Where do you reside?

6

1   A.    1136, Hedgerow Lane, Harrisburg,
2 Pennsylvania 17111.
3   Q.    Are you currently employed?
4   A.    Yes.
5   Q.    How are you currently employed?
6   A.    I work for the Commonwealth of
7 Pennsylvania for the Department of Public Welfare.
8   Q.    How long have you been employed for the
9 Department of Public Welfare?
10   A.    November 19th of '04.
11   Q.    Since November 19th of '04?
12   A.    Yes.
13   Q.    In what capacity are you employed for
14 the Department of Public Welfare?
15   A.    I'm an info-maintenance case worker.
16   Q.    What does that mean?
17   A.    I'm a welfare case worker.  I work with
18 welfare recipients determining what kind of benefits
19 they're eligible for.
20   Q.    What specifically does that involve?
21 Give me a brief synopsis, if you will, of your daily
22 activities?
23   A.    A client comes in applying for benefits
24 and I take that application, interview the client,
25 make a determination as to whether or not they are

**7**

1  eligible for the benefits they are seeking.
2      Q.      Between October 3rd of 2003 and
3  November 19th, 2004, how, if at all, were you
4  gainfully employed?
5      A.      I started with the Commonwealth of
6  Pennsylvania's clerical pool in July of '04.  Prior
7  to that, I worked at a temp agency, Drexel, and that
8  was from June of '04 to July of '04.  Prior to that,
9  I was in school, in college.
10     Q.      And was that Harrisburg Area Community
11 College?
12     A.      Yes, I completed my second degree
13 there.
14     Q.      What degree did you obtain?
15     A.      Business management.
16     Q.      Is that a two-year degree?
17     A.      Yes, it is.
18     Q.      What period of time were you just
19 attending classes and not working, if any, following
20 October 3rd of 2003?
21     A.      Until June of 2004.
22     Q.      From October 3rd of 2003 until June of
23 2004 you only attended classes, did not work; is that
24 correct?
25     A.      I looked for employment and went to

**8**

1  school, yes.
2      Q.      What type of employment were you
3  looking for during that period of time?
4      A.      I applied with several people.  I
5  applied at Vartan Bank because I have banking
6  experience.  Pennsylvania Higher Education Assistance
7  Agency.  Quite a few temporary agencies, Drexel, SHS
8  Staffing, JFC Staffing.  There were quite a few that
9  I applied for.  New Cumberland Army Depot and the
10 Mechanicsburg Navy Depot.
11     Q.      When you say you applied, can you tell
12 me whether it was in response to a classified
13 advertisement or some other means?
14     A.      Some were job postings that were out on
15 the Internet.  To get employment with the Federal
16 Government they have their own web site, USA Jobs.
17     Q.      Okay.
18     A.      I would go in there and apply for
19 different positions that were available there.
20     Q.      Did you need to take something like a
21 Civil Service Test to acquire a job with the Federal
22 Government?
23     A.      Not with the Federal Government, no.
24     Q.      Did you ever have to take a Civil
25 Service Test to be awarded a position with an agency?

**9**

1      A.      I have taken several Civil Service
2  Tests, quite a few.
3      Q.      When was the last time you took a Civil
4  Service Test?
5      A.      That would be August of this year.
6      Q.      Were you applying for a particular
7  position?
8      A.      I took a test for an Aging Services
9  Specialist, work with the Department of Aging.  I
10 took a test for Corrections Counselor with the State
11 Prison System.  I took three tests in one day, but I
12 can't recall what the third test was.
13     Q.      In addition to taking the test, you
14 also have to fill out some sort of application; is
15 that correct?
16     A.      Yes, you do.
17     Q.      Have you completed applications in
18 correlation with the tests that you've recently taken
19 to these various departments within the state
20 government?
21     A.      No.  When you take a Civil Service Test
22 you just schedule yourself for the test, your
23 credentials, you schedule yourself for the test, go
24 in and take your test.
25     Q.      How would you then be notified if

**10**

1  someone was interested in interviewing or hiring you
2  for a position within those departments?
3      A.      You would get a job availability survey
4  asking whether or not you are available or if you're
5  still interested in the position that you had taken
6  the test for.
7      Q.      Once you completed that survey what
8  happens next, if you know?
9      A.      If they are interested they contact
10 you and set up an interview.
11     Q.      Of the three positions that you applied
12 for in the various departments this past August, have
13 you been provided with a survey?
14     A.      I received a survey for one.
15     Q.      Which one was that?
16     A.      That was for Corrections Counselor.
17     Q.      Do you know whether the position of a
18 Corrections Counselor offers a higher pay scale than
19 what you're presently receiving?
20     A.      Yes, it does, it is a higher position,
21 it is a lateral position and then there is a higher
22 position, Correction Counselor I and II.
23     Q.      Must you apply for the Corrections
24 Counselor I or could you also apply for the
25 Corrections Counselor II?

11

```
 1      A.      If you have the credentials you can
 2 apply for both.
 3      Q.      Do you have the credentials to apply
 4 for both?
 5      A.      Yes, I did.
 6      Q.      Did you receive an interview?
 7      A.      Yes, I did receive an interview.
 8      Q.      When was that interview?
 9      A.      That was in September, that was this
10 month.
11      Q.      September of '06?
12      A.      Un-huh, September '06.
13      Q.      Is that a yes?
14      A.      Yes.
15      Q.      Was that interview in relation to
16 application for Corrections Counselor positions I and
17 II?
18      A.      Yes.
19      Q.      When will you know whether or not
20 you've been accepted for either of those positions?
21      A.      The decision hasn't been made yet.
22      Q.      How much more money will you make if
23 you're accepted for either one of those positions?
24      A.      The I is a lateral so it wouldn't be an
25 increase.  The II is maybe $8,000 more than what I
```

12

```
 1 make a year now.
 2      Q.      Would there be additional benefits or
 3 anything different, different hours, something that
 4 improves the quality of your job by taking a position
 5 as a Corrections Counselor I or II over what you're
 6 doing presently?
 7      A.      No.  If you're going inside a state
 8 correctional facility you're more at risk.  I'm more
 9 at risk than where I am at the welfare office.
10      Q.      It is not exactly improving your
11 quality of life taking a position as a Correction
12 Counselor I or II?
13      A.      No, it is not.  Well, your income would
14 be more, but you're more at risk because you're
15 within the institution with the inmates.
16      Q.      Notwithstanding the risk, you're still
17 interested in the position?
18      A.      Yes, I am.  My Bachelor's Degree is in
19 Criminal Justice.
20      Q.      I'd like you to take a look, if you
21 will, Mr. Ellis, at the Federal Court Complaint,
22 which is the first document in the stack of documents
23 that I placed in front of you before your deposition
24 started.
25              This document has not yet been marked
```

13

```
 1 as a deposition exhibit, but I'd like to do that now,
 2 if I may, and this would be Deposition Exhibit No.
 3 25.  Have you seen this document before today?
 4      A.      Yes, I have.
 5              (At this time Deposition
 6              Exhibit No. 25 was marked for
 7              identification.)
 8 BY MS. O'DONNELL:
 9      Q.      Was it prepared with your approval and
10 consent?
11      A.      Yes, it was.
12      Q.      Now, I would like to draw your
13 attention to paragraph 16 on page 4 and ask you to
14 read that sentence to yourself silently and let me
15 know when you're finished.
16      A.      I'm finished.
17      Q.      The sentence reads, "At all relevant
18 times each of the Defendants had a supervisory role
19 over the Plaintiff."  Did I read that correctly?
20      A.      Yes.
21      Q.      Is that true?
22      A.      If not supervisory they were next in
23 the chain of command.
24      Q.      Would Meredith Tulli be next in the
25 chain of command over you?
```

14

```
 1      A.      No, she would not.
 2      Q.      So is that sentence correct?
 3      A.      I can't say.
 4      Q.      Well, this pleading was filed with your
 5 consent and approval; is that correct?
 6      A.      Correct.
 7      Q.      Did you read it before it was filed?
 8      A.      Yes.
 9      Q.      And did you --
10              MR. ARCHER:  I'll object to the
11 question.  I think it is asking her to provide legal
12 conclusion.
13              MS. O'DONNELL:  Well, subject to
14 objection, Ms. Ellis -- and I'm not asking you to
15 testify to a legal conclusion.  I'm simply asking
16 whether, in fact, Meredith Tulli had a supervisory
17 role over you at the time that you were employed at
18 the Harrisburg Area Community College.
19              THE WITNESS:  I wouldn't say
20 supervisory.  I would say she was higher up in the
21 chain of command above my supervisor.
22 BY MS. O'DONNELL:
23      Q.      Paragraph 17, if you would, please,
24 read that paragraph to yourself and let me know when
25 you're finished.
```

15

```
 1      A.    All right.
 2      Q.    That sentence indicates that you filed
 3 a complaint with the Pennsylvania Human Relations
 4 Commission on February 1st of 2002 alleging racial
 5 discrimination against Harrisburg Area Community
 6 College, does it not?
 7      A.    Yes.
 8      Q.    Is that true?
 9      A.    Yes.
10      Q.    What was the precise nature of the
11 racial discrimination that you complained to the PHRC
12 about?
13      A.    I complained about not being able to
14 take classes as other individuals were allowed to
15 take classes.
16      Q.    When you say other individuals, do you
17 mean other individuals who are African American or
18 only those individuals that were Caucasian or some
19 other race?
20      A.    Caucasian or some other race.
21      Q.    When you filed your complaint with the
22 Pennsylvania Human Relations Commission, did you mean
23 to suggest that no other African American employee at
24 the Harrisburg Area Community College was ever
25 allowed to take a class during the day or prevented
```

16

```
 1 from taking a class?
 2      A.    No, I did not.
 3            MR. ARCHER:  Objection to the form.
 4 BY MS. O'DONNELL:
 5      Q.    What was your intent when you filed the
 6 complaint with the Pennsylvania Human Relations
 7 Commission that portrayed the Harrisburg Area
 8 Community College to discriminate against you on the
 9 basis of your race in disallowing you to take classes
10 during the day?
11            MR. ARCHER:  Objection to the form.
12            THE WITNESS:  Can you rephrase that or
13 ask that again?
14            MS. O'DONNELL:  What is the basis for
15 the objection?
16            MR. ARCHER:  Basis for the objection is
17 I don't understand it.
18            MS. O'DONNELL:  Ms. Ellis, do you
19 understand my question?
20            THE WITNESS:  No, I don't.
21 BY MS. O'DONNELL:
22      Q.    What was your intent in filing the
23 complaint with the Human Relations Commission
24 alleging race discrimination?  How did the College
25 discriminate against you as a black woman?
```

17

```
 1      A.    Because I was not allowed to take
 2 classes.  I had asked from the time that I started to
 3 be allowed as I was told in my interview and I was
 4 not allowed to.
 5      Q.    Are you saying that within your
 6 department white women were you allowed to take
 7 classes during the day from the time that you were
 8 hired until the time you filed your complaint in
 9 February 1st of 2002?
10            MR. ARCHER:  Objection.
11            MS. O'DONNELL:  There is no objection
12 -- pardon me.
13            MR. ARCHER:  There is an objection.
14            MS. O'DONNELL:  There is an objection
15 but you can answer the question.
16 BY MS. O'DONNELL:
17      Q.    Are you saying --
18            MR. ARCHER:  I'm quite certain there is
19 an objection.
20 BY MS. O'DONNELL:
21      Q.    Were you saying to the Pennsylvania
22 Human Relations Commission on February 1st, 2002,
23 when you filed your complaint, that there was a white
24 woman who was allowed to take classes during the day
25 and you were not?
```

18

```
 1      A.    Yes, there were incidents of that.
 2      Q.    When you say there were incidents of
 3 that, tell me precisely who was allowed to take
 4 classes within your department during the day?
 5      A.    Do you mean within my department or
 6 within my division?
 7      Q.    What did you mean when you filed your
 8 complaint with the PHRC?
 9      A.    I meant within the whole division of
10 finance.
11      Q.    Did Barb Hutchinson oversee the whole
12 division of finance?
13      A.    Yes, she did.
14      Q.    When she issued an edict that people
15 were not allowed to take classes during the day, was
16 it exclusively directed to the entire division of
17 finance or within your particular area of service?
18      A.    It was directed to me.  She sent out
19 that e-mail to all the employees to let them know
20 that no one could take classes because of me.
21      Q.    We'll get to that.  If it was directed
22 to all employees, do you believe that that memo
23 intended to cover all employees irrespective of what
24 color their skin was?
25      A.    Yes.
```

19

```
 1      Q.      Was that memo issued before or after
 2 February 1st, 2002?
 3      A.      Before.
 4      Q.      I'd like to direct your attention, if I
 5 may, to paragraph 19 at the top of page 5 and ask you
 6 to read that to yourself silently and tell me when
 7 you're finished.
 8      A.      I'm finished.
 9      Q.      It reads, "Prior to filing her PHRC
10 complaint, the Plaintiff had received exemplary
11 performance reviews." Did I read that correctly?
12      A.      Yes, you did.
13      Q.      I'd like you to look at the next
14 document in the pile of documents that I've placed in
15 front of you. Answer to Question 2A-2. I'll tell
16 you precisely where that is. That would be at top of
17 page 6. Second sentence in paragraph 2 reads, "In
18 fact, the only performance review she received was a
19 favorable review in 1999." Do you see that?
20      A.      Yes, I do.
21      Q.      Can you tell me whether the information
22 in paragraph 9 of the complaint or the information
23 contained in paragraph 1 of page 6 in your Answers to
24 Interrogatories is the correct information?
25              MR. ARCHER: I'm going to object to the
```

21

```
 1      A.      That is what that says.
 2      Q.      If you look in your Answer to
 3 Interrogatory of 2A-2 at the top of page 6 that says,
 4 "In fact, the only performance review she received
 5 was a favorable review in 1999." Is that correct?
 6      A.      That is what that says, yes.
 7      Q.      Is it not true that you received
 8 performance reviews, whether they were exemplary or
 9 not, from 1998 to 2002 with the exception of 1999?
10      A.      Rephrase the last part of that
11 question.
12      Q.      Let me try this a different way. Did
13 you receive any performance review in 1998?
14      A.      I don't recall.
15      Q.      Did you receive a performance review in
16 1999?
17      A.      Yes, I did.
18      Q.      How do you know that?
19      A.      I have a copy of it.
20      Q.      Did you receive a performance review in
21 the year 2000?
22      A.      Not that I recall.
23      Q.      Did you receive a performance review in
24 2001?
25      A.      Not that I recall.
```

20

```
 1 form of the question. I think those are mutually
 2 exclusive statements.
 3 BY MS. O'DONNELL:
 4      Q.      For the record then, let's read them
 5 next to each other. Paragraph 19 in the complaint
 6 reads, Prior to filing her complaint, Plaintiff had
 7 received exemplary performance reviews. Would you
 8 agree with me, Ms. Ellis, that the complaint that we
 9 are talking about presently is February 1st of 2001?
10      A.      Say that again?
11      Q.      Okay. Look at paragraph 19 of the
12 complaint. That reads, "Prior to filing her PHRC
13 complaint, Plaintiff had received exemplary
14 performance reviews." Did I read that correctly?
15      A.      Yes, you did.
16      Q.      And the PHRC complaint that we just
17 talked about was filed on February 1st of 2001,
18 correct?
19      A.      I thought it was 2002.
20      Q.      Pardon me. February 1st of 2002, you
21 are correct.
22      A.      Okay.
23      Q.      Your sentence 19 in your complaint
24 means that prior to February 1 of 2002 you received
25 exemplary performance reviews; is that correct?
```

22

```
 1      Q.      Did you receive a performance review in
 2 2002?
 3      A.      Not that I recall.
 4      Q.      In fact, the only performance review
 5 that you recall you recall being exemplary; is that
 6 correct?
 7      A.      Repeat that.
 8      Q.      Do you know what the word exemplary
 9 means?
10      A.      Yes, I do.
11      Q.      The only performance review that you
12 recall receiving you recall being exemplary; is that
13 correct?
14      A.      I don't know if exemplary is the
15 correct terminology. I received a favorable review
16 in 1999. As I said, I can't recall whether or not it
17 was exemplary or not. There were no performance
18 issues listed in the review.
19      Q.      The word exemplary in the pleading
20 might not be the right word; is that correct?
21      A.      I can't say yes or no to that question.
22      Q.      Let's go down to paragraph 23 in your
23 complaint. That reads, again, that is on page 5 of
24 the complaint, "Plaintiff's filing of her PHRC
25 complaints as well as her expressed interest in
```

23

1 participating in a minority caucus group constituted
2 protected activities pursuant to 42 USC Section
3 2000E-5 and in parentheses title Roman 7. Did I read
4 that correctly?
5        A.      Yes, you did.
6        Q.      What does that mean that you expressed an
7 interest in participating in a minority caucus group?
8        A.      That I would have liked to be included
9 in that group and attend the meetings that that group
10 had.
11       Q.      Did the group have a name?
12       A.      Minority caucus.
13       Q.      Did the group meet on a regular basis?
14       A.      I do believe they did.
15       Q.      Do you know when they met?
16       A.      No, I do not.
17       Q.      When you say that you expressed an
18 interest in participating in the minority caucus
19 group, to whom did you express that interest?
20       A.      The group, the minority caucus group.
21       Q.      Did you express an interest at a
22 meeting?
23       A.      No.
24       Q.      Did you express an interest in passing
25 to someone in the group?

24

1        A.      Yes.
2        Q.      Did you express an interest in passing
3 to more than one person in the group?
4        A.      I don't recall.
5        Q.      Do you recall the name of the person to
6 whom you expressed that interest?
7        A.      Yes.
8        Q.      What was the name of that person?
9        A.      It is Getachew -- I can't even say it.
10       Q.      I think we'll see an exhibit later on
11 in your deposition and you tell me whether or not
12 that is the person you're thinking of. Okay?
13       A.      Okay.
14       Q.      Did this person whose name you can't
15 pronounce have a rent position within the group?
16       A.      I don't know.
17       Q.      How did you come to know that he would
18 be a person to talk to and to express your interest
19 about being a member?
20       A.      I don't recall.
21       Q.      Do you recall that you expressed an
22 interest in participating in this minority caucus
23 group within the department for which you worked at
24 HACC?
25       A.      No.

25

1        Q.      So then do I understand your testimony
2 correctly that the only person to whom you expressed
3 that interest is this gentleman whose name you can't
4 pronounce?
5        A.      Correct.
6        Q.      In paragraph 24 it states, "At all
7 relevant times each of the Defendants to this action
8 knew or should have known that Plaintiff had
9 participated in protected activity under state and
10 federal law."
11               Assuming that in paragraph 23 above it
12 reads that your participation in a minority caucus
13 group constitutes protected activity, my question to
14 you is: How did you expect Thomas Dick to know or
15 should have known that you expressed an interest in
16 participating in the minority caucus group if you
17 didn't tell him?
18               MR. ARCHER: I'll object on several
19 grounds. One, it is causing her to make a legal
20 conclusion as to what is protected activity.
21 Protected activity -- I'm also going to object
22 because it assumes that the only protected activity
23 that is referred to there is interest in joining a
24 minority caucus group.
25               MS. O'DONNELL: Let me explain the

26

1 reason why I crafted the question that way. It was
2 because if I asked whether it applied to both, you
3 would object on the basis it was compound so I took
4 it out.
5 BY MS. O'DONNELL:
6        Q.      Ms. Ellis, I do not mean to ask you to
7 draw a legal conclusion about whether or not anybody
8 was correct or incorrect in determining whether
9 joining a minority caucus group is a protected
10 activity under the law. I don't expect you to know
11 that. I expect your lawyer to know that, not you.
12               All I'm asking you is does this
13 sentence mean that you expected Mr. Dick to know that
14 you had expressed an interest in participating in a
15 minority caucus group even though you just testified
16 that you didn't tell him?
17       A.      Mr. Dick addressed me about
18 participating in a minority -- actually, accused me
19 of participating in these meetings.
20       Q.      Am I to infer then correctly from that
21 testimony that somehow Mr. Dick found out that you
22 had expressed an interest in participating in the
23 minority caucus group, although you didn't tell him?
24       A.      Correct.
25       Q.      How about Barbara Hutchinson, how would

27

1 she know or why should she have known that you had
2 expressed an interest in participating in the
3 minority caucus group if you didn't tell her?
4           MR. ARCHER:  I'm going to object.  The
5 complaint says that each of the Defendants knew or
6 should have known that the Plaintiff participated in
7 protected activity under state and federal law.
8           MS. O'DONNELL:  And protected activity
9 above --
10          MR. ARCHER:  Excuse me.
11          MS. O'DONNELL:  -- is defined as both.
12          MR. ARCHER:  No, it is not.  That
13 statement means that all of the Defendants, any of
14 the Defendants, could have known of one, the other,
15 or both.
16          MS. O'DONNELL:  Let her answer.  You
17 don't have to testify for her.
18          MR. ARCHER:  Your question assumes that
19 Barbara Hutchinson knew about one or the other and
20 that just is not true.
21 BY MR. O'DONNELL:
22    Q.     Is that true, Barbara Hutchinson didn't
23 know?
24    A.     As per Barbara's testimony, Tom
25 reported to her so that is probably how she found

28

1 out.
2    Q.     So the only way you think that Barbara
3 Hutchinson knew was based on her testimony today that
4 Tom reported to her?
5    A.     Correct.
6    Q.     Is that an inference or is that
7 something you know directly?
8    A.     I don't know.
9    Q.     As I instructed you earlier today, I
10 don't want you to guess or speculate or make personal
11 opinions.  I simply want to know the facts.  If you
12 know that Tom Dick told Barbara Hutchinson tell me
13 that?  If you don't know, tell me you don't know.
14    A.     I do not know.
15    Q.     Do you know whether or not Meredith
16 Tulli was aware or should have been aware that you
17 had expressed an interest to participate in the
18 minority caucus group?
19    A.     I don't know.
20    Q.     I want to follow-up on something that
21 you had testified to a few moments ago and that was
22 that Mr. Dick approached you and I believe your word
23 was accused you of participating in the minority
24 caucus group.  Tell me more about that?  When did it
25 happen?

29

1    A.     I can't give a definite time or date.
2    Q.     Was it around the time that you had
3 expressed the interest in participating?
4    A.     No, it was after the filing of the
5 Human Relations complaint.
6    Q.     Of the first or the second Human
7 Relations complaint?
8    A.     The first.
9    Q.     After February 1st of 2002, Mr. Dick
10 approached you or accused you of participating in the
11 minority caucus group.  Was it between filings?  In
12 other words, was it between complaints filed with the
13 PHRC that this conversation occurred?
14    A.     I can't elicit a date at this point in
15 time.
16    Q.     You can't recall?
17    A.     No.
18    Q.     Tell me what he said?
19    A.     He said that he knew that I was going
20 to minority caucus meetings.
21    Q.     Were you, in fact, going to minority
22 caucus meetings?
23    A.     No, I was not.
24    Q.     You don't know when the minority caucus
25 meetings were being held?

30

1    A.     No, I do not.
2    Q.     Maybe we'll come back to that.  I want
3 to explore further whether in paragraph 24 you know
4 that Thomas Dick was aware or should have been aware
5 that you filed the PHRC complaint February 1st of
6 2002?  How do you know that?  How do you know whether
7 or not Thomas Dick was aware of the filing of the
8 first complaint?
9    A.     I don't know.
10    Q.     Do you know whether Meredith Tulli was
11 made aware that you had filed a Pennsylvania Human
12 Relations complaint as of February 1st, 2002?
13    A.     They would have been notified by the
14 Human Relations Commission, but I don't know
15 personally when they got that information.
16    Q.     Or if they got that information?  Do
17 you know personally whether, in fact, they got that
18 information from the Pennsylvania Human Relations
19 Commission?
20    A.     How do I know that personally?
21    Q.     Well, I'm asking you.  Do you have that
22 knowledge?  If you say no, I'll accept that as your
23 answer.
24    A.     No.
25    Q.     What about Barbara Hutchinson, do you

31

1  know personally whether or not Ms. Hutchinson was
2  made aware that you filed a complaint with the PHRC
3  on February 1st, 2002?
4          A.     No, I do not.
5          Q.     Okay.  In paragraph 25 you state, "That
6  following the filing of your PHRC complaint, again,
7  we are still sticking with the February 1st, 2002
8  complaint, it says that she, meaning you, was subject
9  to repeated abuse, harassment, and adverse employment
10 actions by Defendants, plural, substantially based on
11 her race and/or participation in protected employee
12 activity."  Did I read that correctly?
13         A.     Yes, you did.
14         Q.     Now, I have a couple of questions.  I'm
15 going to break that paragraph up into pieces so that
16 it is not complicated or convoluted for both of us.
17 Okay?
18                The first is did Meredith Tulli subject
19 you to repeated abuse, harassment, or an adverse
20 employment action based on your race after you filed
21 the first PHRC complaint?
22         A.     I can't answer that question.  I don't
23 know.
24         Q.     Let me ask you this question:  Did
25 Barbara Hutchinson subject you to repeated abuse,

32

1  harassment, or an adverse employment action based on
2  your race after you filed your first PHRC complaint
3  on February 1st, 2002?
4          A.     I can't answer that question.
5          Q.  Is that because you don't know?
6          A.     No, because you're limiting it to the
7  first complaint.
8          Q.     That is how this complaint reads,
9  ma'am.  This is your complaint.  I'm just asking you
10 questions about it.
11         A.     But you're limiting it to the first
12 complaint.
13         Q.     But that is how this paragraph reads?
14         A.     I can't answer that question.
15         Q.     Is that because you don't know?
16         A.     No, because I can't answer the
17 question.  I don't know what you're looking for.  I
18 cannot answer that question.
19         Q.     Let me just ask you to explain then
20 what you mean by after you filed your PHRC complaint
21 on February 1, 2002, you were subjected to repeated
22 abuse, harassment, and adverse employment actions by
23 Defendants substantially based on your race.  Do you
24 see that?
25         A.     Yes, I do see that.

33

1          Q.     And Meredith Tulli is a Defendant in
2  this case, is she not?
3          A.     Correct.
4          Q.     And Barbara Hutchinson is a Defendant
5  in this case, is she not?
6          A.     Correct.
7          Q.     I'm asking you to explain what you mean
8  by what is written in this complaint that you
9  reviewed and consented to before it was filed in
10 Federal Court.  What does this mean?
11         A.     That I was subjected to abuse,
12 harassment, and adverse employment activity.
13         Q.     By Meredith Tulli and Barbara
14 Hutchinson?
15         A.     They were not directly above me --
16                MR. ARCHER:  I'm going to object to the
17 question because --
18                THE WITNESS:  You are just digging for
19 straws.
20                MS. O'DONNELL:  No, I'm not digging for
21 straws.
22                THE WITNESS:  Yes, you are.
23                MS. O'DONNELL:  I'm digging for facts.
24                MR. ARCHER:  The question reads that
25 the Defendants, each of the Defendants, did either

34

1  abuse, harass, or cause adverse employment actions.
2                MS. O'DONNELL:  I'm getting to the
3  either part and then I'll get to the or part.  I
4  explained that I was going to break up these
5  questions in the paragraphs to make it easy to
6  understand.
7  BY MS. O'DONNELL:
8          Q.     Do you have any information to support
9  the allegations in the complaint based on the fact
10 that you were subjected to repeated abuse by either
11 Meredith Tulli or Barbara Hutchinson based on your
12 race after you filed your first PHRC complaint?
13         A.     No.
14         Q.     Do you have any information based in
15 fact to support the allegation that you were
16 subjected to harassment based on your race by either
17 Meredith Tulli or Barbara Hutchinson after you filed
18 your first complaint?
19         A.     No.
20         Q.     Do you have any facts to support the
21 allegations that you were subjected to repeated abuse
22 or harassment by Thomas Dick after you filed your
23 first PHRC complaint?
24         A.     Yes.
25         Q.     Tell me what that abuse and harassment

35

1  was?
2          A.          One instance was when I wanted to get
3  my books for the upcoming semester, I always got my
4  books before we left for Christmas break.  Tom
5  devised a new way that I had to comply with to be
6  able to get my books when I never had to do that any
7  previous semesters.  I had to sign a permission slip
8  for them to test on my account to be able to get my
9  books.
10         Q.          Sign a permission slip for them to
11 test?
12         A.          To run a book store feed against my
13 account.  Previously, my account had been used
14 without my permission for testing.
15         Q.          Right, I remember seeing memos about
16 that.
17         A.          Yes, there were.
18         Q.          I don't understand specifically what
19 Tom Dick did that was abusive or harassing by
20 devising a new way for you to get your books?
21         A.          Because it was never done before.  All
22 I had to do was go to the book store and ask the book
23 store manager for my books and get my books.  I never
24 had to sign a permission slip to agree to have them
25 do testing on my account.  I've never given them

36

1  permission to do testing on my account.
2          Q.          After you signed the permission slip,
3  do you know whether or not they still did testing on
4  your account?
5          A.          No.  Once I complained about it, it
6  wasn't done again.
7          Q.          Did you complain before or after you
8  had to sign the permission slip?
9          A.          I complained before.
10         Q.          Do you know if anybody else had to sign
11 permission slips?
12         A.          No, I do not.
13         Q.          Does that mean you don't know before or
14 after you made your complaint?
15         A.          No, I do not know either way.
16         Q.          Is there anything else that Tom Dick
17 did that was abusive or harassing after you filed
18 your first PHRC complaint?
19         A.          He gave me a Post-It note with a job on
20 it that was outside of the campus.  It said that I
21 needed to look at that.
22         Q.          Okay.  This is after you filed your
23 first PHRC complaint?
24         A.          Yes.
25         Q.          Do you recall when precisely it was?

37

1          A.          No, I do not.
2          Q.          Do you recall when generally it was?
3          A.          No, I do not.
4          Q.          Do you recall whether it was before you
5  filed your second PHRC complaint?
6          A.          No, I do not.
7          Q.          Do you recall whether it was after you
8  filed your second PHRC complaint?
9          A.          No, I do not.
10         Q.          But you're absolutely sure it did not
11 happen before you filed your first complaint?
12         A.          I'm positive.
13         Q.          How can you be so positive?
14         A.          Why would he be handing me job postings
15 outside of the campus.
16         Q.          You can't think of any other reason why
17 he would hand you a Post-It note --
18         A.          No, I do not.
19         Q.          Can I finish my question.
20         A.          Go ahead.
21         Q.          You can't think of any other reason
22 that he would be handing you a Post-It note for a job
23 advertisement outside of the campus unless it had
24 something to do with your filing the PHRC complaint?
25         A.          Rephrase that.

38

1          Q.          Sure.  You can't think of any other
2  reason besides the fact that you filed your PHRC
3  complaint that would have given rise or motivated Tom
4  Dick to hand you a Post-It note with a job
5  advertisement on it?
6          A.          No, I do not.
7          Q.          Do you know whether or not he handed
8  any Post-It notes with job advertisements to white
9  employees either before or after you filed your PHRC
10 complaint?
11         A.          No, I do not.
12         Q.          Is there anything else that you recall
13 that was abusive or harassing to you following the
14 filing of your first PHRC complaint by Tom Dick?
15         A.          The request for -- we never received
16 this before, but they requested each employee to
17 disclose how many employees were going to be taking
18 classes, how many family members were going to be
19 taking classes, that had never been done before.
20         Q.          All employees or just you?
21         A.          All employees within our office.
22         Q.          Were there white employees within your
23 office?
24         A.          Yes.
25         Q.          Did this happen after the filing of the

39

41

1 first PHRC complaint?

2     A.     Yes.

3     Q.     Did it happen before the filing of the

4 second PHRC complaint?

5     A.     I'd have to look through the e-mails.

6     Q.     You don't know as you sit here today?

7     A.     I don't know.

8     Q.     Can we agree it might have happened

9 after the filing of the second PHRC complaint, you

10 just don't recall?

11     A.     I don't recall.

12           MR. ARCHER: I'm going to object. The

13 second PHRC complaint wasn't filed until after she

14 left so it is impossible.

15           MS. O'DONNELL: Would you like to sit

16 for the deposition?

17           MR. ARCHER: No, I would not, but I

18 think you're attempting to confuse her.

19           MS. O'DONNELL: I think she should know

20 her lawsuit and I think she does. She can testify.

21 She didn't remember and that is fine.

22 BY MS. O'DONNELL:.

23     Q.     I understand what you're telling me,

24 there are e-mails out there or some type of memo from

25 Tom Dick to the staff and your former department that

---

1 plan forms when I needed them.

2     Q.     Not allowed to purchase --

3     A.     Payment plan forms.

4     Q.     What does that mean?

5     A.     I wasn't allowed to get the forms that

6 we needed to use for the upcoming semester.

7     Q.     When did that occur?

8     A.     That would have been for the upcoming

9 fall semester.

10     Q.     In '02, '03 or before?

11     A.     It would be going into '03.

12     Q.     You filed your complaint February 1 of

13 2002. Would it have been for the fall semester of

14 2002 or fall semester 2003?

15     A.     Fall semester 2003.

16     Q.     You have to buy the forms?

17     A.     Yes, buy the forms. You have to have

18 them printed.

19     Q.     How much does that cost?

20     A.     I have no idea. I just put in a

21 request.

22     Q.     Did you ever have to pay for them?

23     A.     Me personally?

24     Q.     Because you said not allowed to

25 purchase payment plan forms?

---

40

1 essentially requires you all to disclose the nature

2 of the classes or identify the nature of the classes

3 you're taking or the nature of the classes that your

4 relatives are taking?

5     A.     Not nature. Who would be using tuition

6 remission.

7     Q.     What does tuition remission mean?

8     A.     It means HACC pays for your classes.

9     Q.     And you felt that was abusive and

10 harassing toward you?

11     A.     It was never done before that they

12 needed an accounting of who was going to be taking

13 classes.

14     Q.     Other than filing the PHRC complaint,

15 you can't think of any other reason why Tom Dick

16 would need that information?

17     A.     No.

18     Q.     And does tuition remission mean you

19 don't have to front the tuition, you submit a form

20 and HACC pays for it upfront?

21     A.     Right.

22     Q.     Now, is there anything else that Tom

23 Dick did that was abusive or harassing towards you

24 after you filed your first PHRC complain?

25     A.     I was not allowed to purchase payment

---

42

1     A.     I was not allowed to function in my job

2 and get the forms that I needed to perform my job

3 duties.

4     Q.     When did that take effect? For the

5 fall of 2003? What I'm asking you is there was a

6 point in the summer of 2003 when you took some time

7 off, right?

8     A.     It was the end of August of 2003.

9     Q.     How much time did you take off?

10     A.     I took off a week.

11     Q.     Did he prevent you from purchasing

12 payment plan forms before you went on vacation or

13 after you got back from vacation?

14     A.     It would have been before.

15     Q.     Okay.

16     A.     Because the fall semester was ready to

17 start.

18     Q.     How much time before that would he have

19 prevented you from purchasing payment plan forms?

20     A.     There is an e-mail that I sent to him

21 asking to be able to purchase the forms.

22     Q.     And he told you no?

23     A.     He finally told you yes, but he

24 previously told me no.

25     Q.     Did he tell you no verbally or did he

1 tell you no in writing?
2    A.    I don't recall.
3    Q.    Then ultimately he told you yes?
4    A.    Yes, he did.
5    Q.    Then did you purchase those payment
6 plan forms?
7    A.    Yes, I did.
8    Q.    At the time that he told you no, were
9 you primarily responsible for purchasing payment plan
10 forms?
11    A.    Yes, because I was the administrator of
12 the plan to keep the forms in-house so then they were
13 available for the students to use.
14    Q.    Oh, I see.  You were ordering
15 inventory, is that right, you needed forms for the
16 students to purchase?
17    A.    Correct.
18    Q.    You were low on inventory, you needed
19 to order them, he told you no?
20    A.    Correct.
21    Q.    Eventually, he told you go ahead and
22 order them?
23    A.    Correct.
24    Q.    Gotcha.  Anything else that you can
25 think of that he did that was abusive or harassing?

---

44

1    A.    Changing my access so I couldn't run
2 the payments from the Banner system into the payment
3 plan system.
4    Q.    That was when you came back from
5 vacation?
6    A.    No, it was not.
7    Q.    That was before?
8    A.    Yes, it was.
9    Q.    He changed your access?
10    A.    Yes, he had it disabled that I could
11 not run the payment from the Banner system to flow
12 into the payment plan system and that made me have to
13 manually adjust the student accounts on the payment
14 plan system.
15    Q.    That took more time obviously?
16    A.    Yes, it did.
17    Q.    Do you recall when he disabled the
18 computer access and made you do these things
19 manually?
20    A.    That would have been the spring of that
21 semester of 2002.
22    Q.    Spring semester of 2002.  So right
23 after you filed your PHRC complaint?
24    A.    Correct.
25    Q.    Did you ever go back to being able to

---

1 use the Banner system to perform that function?
2    A.    No.
3    Q.    Were you ever told why the system was
4 disabled and why you had to do this work manually?
5    A.    No.
6    A.    He never told you?
7    A.    No.
8    Q.    Did you ever ask?
9    A.    Yes, I did.
10    Q.    And he didn't tell you why?
11    A.    No.
12    Q.    Did you ask verbally or in writing or
13 an e-mail?
14    A.    I asked verbally.
15    Q.    He wouldn't give you an answer?
16    A.    I didn't get an answer.
17    Q.    Anything else that you can think of?
18       MR. ARCHER:  Any other harassment or
19 abuse?
20       THE WITNESS:  Yes, the day I came back
21 from vacation.
22 BY MS. O'DONNELL:
23    Q.    Before we get into that, I want to
24 summarize what you've told me so far about Tom Dick.
25    A.    Okay.

---

46

1    Q.    He made you sign a permission slip to
2 get your books from the book store, you just don't
3 recall whether that was 2002 or 2003?
4    A.    It would have been going into the
5 spring semester of -- semesters change over within a
6 different year so that would have been the spring
7 semester of 2003.
8    Q.    Spring of 2003.
9    A.    That was after the filing of the --
10 well, it was right before the filing of the
11 complaint.
12    Q.    The complaint was February 1 of 2002?
13    A.    That would have been in December.
14    Q.    Of 2002?
15    A.    Of 2001.
16    Q.    Now, your complaint says February 1 of
17 2002, right, February 1 of 2002 is when you filed
18 your PHRC complaint?
19    A.    But that would have been December
20 before we left for Christmas break when I was trying
21 to get my books for the upcoming semester.
22    Q.    This would have happened in December of
23 '01?
24    A.    Yes.
25    Q.    Before you filed your PHRC complaint?

49

```
1     A.     Correct.
2     Q.     We'll scratch that because that didn't
3 happen after the filing of PHRC complaint, right,
4 it happened before?
5     A.     It happened before.
6     Q.     So that doesn't count.  The next thing
7 you told me about in terms of Tom Dick's abuse or
8 harassment after you filed your PHRC complaint on
9 February 1, 2002 is that he gave you a Post-It note
10 for a job outside the campus?
11     A.     Correct.
12     Q.     You didn't know when that happened.
13 You just know it happened after the filing?
14     A.     It was after the filing because it was
15 warm out.  It was towards the end of the spring
16 semester.
17     Q.     Spring semester 2002, right?
18     A.     Correct.
19     Q.     The next thing he did was he made the
20 employees within the department disclose whether they
21 or their family members planned to use the tuition
22 remission plan?
23     A.     Correct.
24     Q.     And that had never been done before?
25     A.     No.
```

48

```
1     Q.     Then he told you you couldn't purchase
2 payment plan forms for the students to use for the
3 upcoming fall semester, but then changed his mind and
4 told you you could and that was sometime in 2003?
5     A.     No, that would have been in 2002.  I
6 left in August of 2003.
7     Q.     I have written down that you said 2003.
8 Is that wrong?  Did I write it down wrong or did you
9 say 2003 before?
10     A.     I'd have to look.  There was an actual
11 e-mail with the dates on there.
12     Q.     You just don't remember whether it was
13 2002 or 2003?
14     A.     No, I do not.
15     Q.     Then you said at some point in the
16 spring of 2002 he disabled your access to the
17 computer system, into the Banner system, and made you
18 manually adjust student accounts?
19     A.     Right.
20     Q.     All of that leads up to the day that
21 you come back from vacation?
22     A.     Correct.
23     Q.     And what happened?
24     A.     I walked into the office, sat down at
25 my desk, I signed on and could not get into any of
```

```
1 the screens that I previously had access to.  He
2 walked by.  I asked him, Tom, is there some reason I
3 can't get into the system?  He shook a pile of
4 payment plan forms at me and told me to come into his
5 office.
6     Q.     Okay.  Now, I'm writing so give me a
7 minute to get this down.  What happened, did you go
8 in?
9     A.     Yes, I went into his office.
10     Q.     Then what?
11     A.     He told me students were dropped.
12     Q.     Right.  Did he tell you how many?
13     A.     No, I did not get a number.
14     Q.     Did you ask for a number to the best of
15 your knowledge or recollection?  Did you ask how many
16 students were dropped?
17     A.     No, I did not.
18     Q.     What is the next thing you remember in
19 that conversation?
20     A.     Him yelling at me and telling me that I
21 intentionally did not enter those students so they
22 would get dropped.
23     Q.     And what did you tell him?
24     A.     I told him I wouldn't intentionally do
25 that.  As long and as hard as I fought to be able to
```

50

```
1 take classes, why would I do that to another student.
2     Q.     What did he say?
3     A.     He said they were found and it looks
4 like you did this.
5     Q.     I want to stop you there for a second.
6 Before you went on vacation, do you remember what you
7 did with those forms?  Do you remember ever having
8 them in your hand?
9     A.     I never got to see the forms.  If I got
10 to see the forms to see the student names, I would
11 have known whether or not I worked on those accounts
12 or not.
13     Q.     Okay.  He shook that pile in front of
14 you?
15     A.     He shook it at me.
16     Q.     You never held your hand out and said
17 let me see them?
18     A.     No, I never got to see them.
19     Q.     Did you ask to see them?
20     A.     It never got to that point.  I started
21 getting screamed at and I got up and left.
22     Q.     Is it possible that those forms could
23 have been somewhere in your desk or a shelf above
24 your desk before you left to go on vacation?
25          MR. ARCHER:  Object.
```

51

1 BY MS. O'DONNELL:

2     Q.    The question is:  Is it possible?

3     A.    No, it is not. It has never happened

4 since I've done that job, never happened on my desk.

5 Anything that I receive, the first thing I do is put

6 their attribute on so they do not get dropped during

7 the no-pay process.  That is the first thing you do

8 when you get those forms.

9     Q.    Do you know whether or not the

10 attributes were placed on these student accounts?

11     A.    I never got to see the accounts to know

12 whether or not I've ever seen those applications.

13     Q.    Were you too angry to ask?

14     A.    No, he was too angry to give me the

15 information.

16     Q.    Did you come back on Monday to talk

17 with Meredith Tulli?

18     A.    Yes, I did.

19     Q.    Did you ask to see whether or not the

20 attributes were placed on the student accounts --

21     A.    No.

22     Q.    -- before you left to go on vacation?

23     A.    Say that again?

24     Q.    Did you ask to see whether the

25 attributes were placed on the student accounts before

52

1 you left to go on vacation?  Not did you ask Meredith

2 before you left to go on vacation, but did you ask to

3 see whether or not the attributes were placed on the

4 student accounts?  Did you look to see if you did

5 that before you left?

6     A.    I never got to see the applications or

7 the people who were dropped.  I never got to see who

8 those students were.

9     Q.    When you sat with Meredith, did you say

10 I want to see whether or not I did this before I went

11 on vacation?

12     A.    No, I did not.  The decision was

13 already made that they were going to remove me from

14 that office.

15     Q.    But didn't you want to know whether or

16 not they were right?

17     A.    Yeah, I wanted to know.

18     Q.    Then why didn't you ask to see?

19     A.    Because they had already made their

20 mind up.

21     Q.    Even if they did, wouldn't you want to

22 know whether or not you actually did or didn't do it

23 before you left?

24     A.    I asked her how do you know these are

25 applications that I worked on.

53

1     Q.    And what did she say?

2     A.    I didn't get a response.  I don't

3 recall what the response was.

4     Q.    Okay.  Between the end of July and the

5 end of August when you took your vacation, were you

6 looking for any jobs outside of HACC?

7     A.    I don't recall.

8     Q.    We've seen before a document dated July

9 29th, 2003, which is a notification to you that your

10 position is going to be eliminated effective October

11 3, correct?

12     A.    Right.

13     Q.    After you got that letter and before

14 you went on vacation, had you looked for any jobs

15 outside of HACC?

16     A.    No, I did not.

17     Q.    Why not?

18     A.    I had no idea they were going to try to

19 get rid of my job before I got that letter on the

20 29th of July.

21     But my question is this:  After you got

22 that letter, now you did know that your position was

23 being eliminated, did you look for any jobs outside

24 of HACC between July 29th and time that you went on

25 vacation in August?

54

1     A.    I don't recall.

2     Q.    Were you worried?

3     A.    Yeah, I was worried, I have three

4 children.

5     Q.    You don't recall whether or not you

6 actually started to look for another job outside of

7 campus?

8     A.    I don't recall.

9     Q.    Did you look inside of campus?

10     A.    I did look around on campus to see what

11 kind of jobs were available and out there.

12     Q.    What did you find?

13     A.    Nothing.

14     Q.    Before you went on vacation, did you

15 have a plan in terms of how you were going to make

16 money after your position was eliminated October 3rd?

17     A.    No, I did not.

18     Q.    Would you have preferred to just stay

19 in your position, the same position that you were in

20 until October 3rd of 2003?

21     A.    Yes, I would have preferred that.

22     Q.    What were you going to do after October

23 3rd?

24     A.    Look for work.

25     Q.    Were you planning on collecting

55

1  unemployment or something?  How were you going to get
2  money?
3      A.      I would apply for unemployment until I
4  found employment, yes.
5      Q.      Did you apply for unemployment?
6      A.      Yes, I did.
7      Q.      Did you collect it?
8      A.      Yes, I did.
9      Q.      Until you started to work in June of
10 the following year?
11     A.      Correct.
12     Q.      While you took classes?
13     A.      Correct.
14     Q.      Did you finish your degree in that
15 time?
16     A.      Yes, I did.
17     Q.      You don't know whether those 21 student
18 forms were actually in your desk because you never
19 got a chance to verify whether that was actually
20 correct information or not?
21         MR. ARCHER:  Objection, objection.
22         MS. O'DONNELL:  What is wrong with it?
23         MR. ARCHER:  What is wrong with it is
24 you said you don't know that those forms were in your
25 desk and it assumes that they were in her desk.

56

1          MS. O'DONNELL:  That is true.
2  BY MS. O'DONNELL:
3      Q.      Do you know whether or not those forms
4  were actually in your desk before you left to go on
5  vacation?
6      A.      No, I do not.
7      Q.      That is because you didn't have an
8  opportunity to verify whether or not they were there
9  when you came back from vacation?
10     A.      I had already turned the payment plan
11 information over to Tep.  Once they sent the letter
12 and told me they were getting ready to get rid of my
13 job, I turned everything that I had over to Tep and
14 started helping Cheri with her job.
15     Q.      When you say once, you were told that
16 after you got the letter on July 29th?
17     A.      Yes.
18     Q.      You turned everything over to Tep?
19     A.      Yes, I did.
20     Q.      So July 29th or July 30th it is now all
21 Tep's problem?
22     A.      I took everything that I had on my desk
23 and put it on his desk and gave it to him.  If that
24 is who they wanted to do the job then that is who I
25 was going to give the information to.  I actually

57

1  stopped working on that job and started doing
2  something else in the office.
3      Q.      Is that something within your
4  discretion?  You could just do that?  You can just
5  say, Tep, okay, you're going to take all of these now
6  and I'm going to do something else in the office?
7      A.      That is who they decided they wanted to
8  do that work.
9      Q.      But I'm asking you if you had that
10 discretion to give everything over to Tep and say
11 you're going to do this all now and I'm going to do
12 something else?
13     A.      I did it.
14     Q.      Did you have to check with anybody and
15 say --
16     A.      No, I didn't.  I did it.
17     Q.      You didn't have to or you just did it?
18     A.      I did it.
19     Q.      You didn't have to check --
20     A.      I wasn't told not to and I wasn't told
21 to do it, but I did it.
22     Q.      Okay.  Now, I guess the next question I
23 have is there an agreement between you and Tep
24 that he would take over everything?  In other words,
25 you say this is all your problem now.  My job is

58

1  being eliminated.  I'm not doing these anymore.  I'm
2  going over to help somebody else and he said, okay,
3  Darla, that is fine with me.  Did he agree with
4  whatever you did?
5      A.      He didn't give it back.
6      Q.      He didn't give it back?
7      A.      No.
8      Q.      Did anybody other than you and Tep
9  overhear that conversation where you said to Tep
10 you're going to do all of this now because I'm going
11 to go over and help somebody else in the department?
12     A.      I don't recall.
13     Q.      You certainly didn't say to Tom Dick
14 I'm giving all of this stuff to Tep to do and I'm
15 going over to help Cheri or someone else in the
16 department?
17     A.      No, I did not.
18     Q.      There is an allegation on page 6,
19 paragraph 27-D, it says, "On or about August 22nd,
20 2003, Thomas Dick arranged to have campus security
21 present at and around Plaintiff's work station upon
22 Plaintiff's return from vacation."  Do you see that?
23     A.      Yes.
24     Q.      Is that a true statement?
25     A.      I don't know if he arranged to have

1  them there.  He was there when I came in and leaning
2  over the top of my work station as Tom was screaming
3  at me.
4       Q.     When you say he, you mean who?
5       A.     Ken Sellers.
6       Q.     Do you know Ken Sellers?
7       A.     I know who he is.
8       Q.     He's not a friend of yours?
9       A.     No, he's not.
10      Q.     Did you have a feeling one way or
11 another about him leaning over your desk when Tom was
12 screaming at you?
13      MR. ARCHER:  Objection.  Did she have a
14 feeling one way or the other?
15      MS. O'DONNELL:  Yes.
16 BY MR. ARCHER:
17      Q.     Did you have a problem with Ken Sellers
18 leaning over --
19      A.     Yes, I did.
20      Q.     Did you tell him you had a problem with
21 that?
22      A.     How was I supposed to tell him when I'm
23 standing there being screamed at?  How was I supposed
24 to say anything to him at all?
25      Q.     Just look at him and say get off my

---

1       Q.     That everyone is getting their reviews
2  now?
3       A.     That everybody had their's.
4       Q.     He said after it was all done,
5  everybody had their review?
6       A.     Yes, everybody had their review.
7       Q.     Do you know how about 2002, did anybody
8  get a review in 2002?
9       A.     I don't know.
10      Q.     How about 2001 do you know if anybody
11 got reviews in 2001?
12      A.     I don't recall.
13      Q.     How about 2000?
14      A.     I don't recall.
15      Q.     How about 1998?
16      A.     I don't recall because I started in '98
17 if I got a six month review in '98.  If I did, I
18 don't recall a copy of it.
19      Q.     How about in 1999 do you know if anyone
20 other than you got a review?
21      A.     I don't know.
22      Q.     The next page 7, Paragraphs I and J at
23 the top, you state, "On or about August 25th of 2003,
24 Plaintiff was terminated from employment by Thomas
25 Dick." Is that a true statement?

---

60

1  desk.
2       A.     No, I was too busy getting screamed at
3  by Thomas Dick.
4       Q.     Paragraph H, the bottom of the page,
5  "Plaintiff did not receive yearly performance reviews
6  as the other employees who were outside of her
7  protected class did." Is that your statement?
8       A.     I did not receive a performance review
9  in the summer of 2003 as every other employee in that
10 office did.
11      Q.     How do you know that every other
12 employee in the office for 2003 --
13      A.     They were all pulled in and given their
14 -- reviewed it with Tom and got their performance
15 review.  I was the only one in the office that did
16 not get one that year.
17      Q.     What month did that happen?
18      A.     That was probably July or August of
19 2003 when everybody got their reviews.
20      Q.     Are reviews confidential?
21      A.     Yes.
22      Q.     How do you know everybody else got
23 their reviews?
24      A.     Because he stated it in front of the
25 office.

---

62

1       A.     It has two other names listed there.
2       Q.     I'm just limiting the question to
3  Thomas Dick.  Did he terminate your employment from
4  HACC on August 25th, 2003?
5       MR. ARCHER:  I'm going to object to the
6  question.
7       MS. O'DONNELL:  Why?
8       MR. ARCHER:  It says, Thomas Dick,
9  Barbara Hutchinson, and Meredith Tulli all had some
10 part in this.
11      MS. O'DONNELL:  Then the next paragraph
12 says each of the Defendants.  It doesn't say
13 Defendants collectively because that is not the way
14 you drafted this complaint and I'm asking --
15      MR. ARCHER:  It says each of them took
16 part.  It doesn't say each of them individually went
17 out and terminated her.  It says each was involved.
18      MS. O'DONNELL:  You don't have to
19 defend your complaint.  I'm just asking Ms. Ellis if
20 she is aware whether or not Mr. Dick terminated her
21 employment on August 25th, 2003.  If you tell me yes
22 or no or he was part of it that would be an
23 acceptable response.
24      THE WITNESS:  He was part of it.
25 BY MS. O'DONNELL:

63

65

1    Q.    Was Barbara Hutchinson also part of it?

2    A.    Yes, she was.

3    Q.    And was Meredith Tulli also part of it?

4    A.    Yes, she was.

5    Q.    In fact, your testimony today is your

6 position was terminated effective August 25th by all

7 of these people collectively?

8    A.    Correct.

9        MR. ARCHER:  No.

10        MS. O'DONNELL:  Well, you tell us --

11        MR. ARCHER:  Because the complaint

12 speaks for itself.  It doesn't say effective August

13 25th.

14        MS. O'DONNELL:  I just asked her.

15        MR. ARCHER:  It speaks for itself.

16        MS. O'DONNELL:  Tom, this is her

17 lawsuit, not your's.  She gets to say whether she

18 feels she was terminated on August 25th or, in fact,

19 terminated by all of these people or one of them.

20        MR. ARCHER:  Fine.  I'm just saying

21 when you miss -- I felt that the question misstated

22 because you said, your words were, that the

23 termination was effective August 25th, 2003 and that

24 is not what it says.

25        MS. O'DONNELL:  But she said yes -- you

1 significance of that date?

2        A.    The 25th is the date that Meredith

3 requested me to come back, because I was already off

4 the campus.  I left the campus the 22nd, the day that

5 Tom stopped me from leaving the office.  She

6 contacted me and asked me to come in and

7 speak with her on the 25th.

8    Q.    Did you in -- that was a Monday, right?

9    A.    Yes.

10    Q.    Did you go in?

11    A.    Yes.

12    Q.    Who else was present during that

13 meeting?

14    A.    Just Meredith.

15    Q.    What did Meredith tell you?

16    A.    I told her that I tried to access the

17 computer and it did not have access.  She told me

18 that wasn't supposed to happen that way.  Tom was

19 supposed to sit down with me and ask what happened,

20 how did 21 people end up getting dropped.

21        I told her that is not what happened.

22 I told her I was accused that I inadvertently let

23 those people get dropped out of their classes.  I

24 told her the reason I came in early on the 22nd was

25 because I was three hours short of a leave for that

64

66

1 understand what the effective means, right?

2        THE WITNESS:  There is a letter from

3 Meredith Tulli stating that that would be my last

4 day.

5 BY MS. O'DONNELL:

6    Q.    Were you paid for the balance of the

7 time between August 25th and October 3rd?

8    A.    No, I was not.

9    Q.    Is that because you were asked to sign

10 a release and you didn't?

11    A.    Right.

12    Q.    And if you signed the release you would

13 have been paid for the rest of the time?

14    A.    Correct.

15    Q.    On August 25th did you meet with Tom

16 Dick, Barbara Hutchinson, and Meredith Tulli for the

17 stated reason that your position was being eliminated

18 and it was, in fact, being terminated on that day?

19    A.    No.

20    Q.    Paragraph I, 27-I reads, "On or about

21 August 25th, 2003" -- I'm going to stop right there

22 and I'm going to ask you whether or not that was the

23 day that you came back from vacation one day early?

24    A.    No.

25    Q.    What is August 25th?  What is the

1 day and we came back from vacation early because I

2 had classes to attend.

3    Q.    Three hours short of leave, what does

4 that mean?

5    A.    That means that I didn't have enough

6 leave to cover the full day.

7    Q.    I gotcha.

8    A.    I went early to cover the whole day.

9 She told me there was a special project that they

10 figured out for me to do outside of the office

11 because Tom didn't want me back in the office

12 anymore.

13    Q.    She specifically said Tom?

14    A.    Yes, she specifically said Tom.  I

15 asked her what type of special project and she said

16 updating the addresses.  She told her I'm not going to

17 sit here and do dummy work for the rest of my time

18 here.  She told me that that would be my last day.

19 If I wouldn't accept the other assignment that they

20 gave me, I couldn't come back to work again.

21    Q.    Did you think to ask Meredith whether

22 there was any other positions within the Finance

23 Department or something other than what you call

24 dummy work that you would have been satisfied doing

25 so that you didn't have to spend your time under Tom

69

1 Dick's supervision but you could still work at HACC
2 until October 3rd?
3     A.     That was the only job that was offered
4 to me was updating addresses for the Department of
5 Finance.
6     Q.     You didn't think to ask isn't there
7 anything else that I can do besides having to do that
8 or work for Tom Dick?
9     A.     I wanted back in my office.  There was
10 no reason for me to be put out of my office like I
11 was.  I was not responsible for those students
12 getting dropped and there was other work in the
13 office I could have done until the October 3rd date.
14     Q.     That is all you would expect?
15     A.     Yes.  Why should I have to leave my
16 office for something I didn't do?
17     Q.     During that meeting with Meredith
18 Tulli, did she mention Barbara Hutchinson's name at
19 all?
20     A.     No, she did not, not that I recall.
21     Q.     When, if ever, did you learn
22 information to support this allegation that Barbara
23 Hutchinson was part of the team that took part in the
24 decision to terminate your employment as of August
25 25th, 2003?

68

1     A.     I can't recall.
2     Q.     But you know it wasn't that day, right?
3     A.     I don't recall.
4     Q.     Is it your contention that all of this
5 happened because you're a black female?
6     A.     And I filed a complaint with the Human
7 Relations Commission, yes.
8     Q.     Is it more one than the other or is it
9 a combination of both, the fact that you're a black
10 female and the fact that you filed a complaint with
11 the PHRC?
12     A.     Combination of both.
13     Q.     Why do you think they based it on your
14 race?  Why do you think any of these three people
15 would -- that Tom Dick would be so angry about these
16 dropped students that he would treat you that way and
17 not treat a white person that way if he got as angry?
18     A.     He probably would treat a white
19 employee the same way, but...
20     Q.     Because he was?
21     A.     Rephrase the question.  Ask that
22 question again.
23     Q.     Was it his personality to treat people
24 this way if he got angry?
25     A.     Yes, it was.

69

1     Q.     It didn't matter what color you were,
2 he got angry, he was likely to do something like
3 that?
4     A.     I can't answer that question.
5     Q.     Okay.  Subparagraph L says, "Defendants
6 individually and in concert -- so we are both on the
7 same page I'm assuming, and correct me if I'm wrong,
8 that is Dick, Hutchinson, and Tulli, have retaliated
9 and discriminated against Plaintiff in that
10 Plaintiff's position was terminated based on invalid
11 and false documentation."  My question to you is:
12 What was the invalid and false documentation that is
13 referred to in that subparagraph?
14     A.     That the plan they devised to
15 decentralize the position to say there was not enough
16 work in the office to warrant my position still being
17 there.
18     Q.     Meredith Tulli was part of devising
19 that plan to decentralize the other --
20     A.     She went along with it.  If she didn't
21 devise it, she went along with it.
22     Q.     There was an exhibit that I saw here --
23 how about Mr. Klunk, was he part of the concerted
24 plan to get rid of your position, too?
25     A.     There was one e-mail from Mike Klunk

70

1 asking to find out -- I received an e-mail from Tom
2 saying Mike Klunk wanted to know how many students
3 that used the payment plan were Lancaster students.
4 That was the only information, he wanted information
5 about the payment plan.  Not that he requested that
6 the payment plan be decentralized.  He just wanted to
7 know how many students from the Lancaster campus
8 participated in the payment plan.
9     Q.     How often would you be consulted if the
10 CEOs of the regional campuses wanted to work with the
11 folks at Harrisburg to restructure part of their
12 programing?  How often would you be part of that
13 team?
14     A.     I was requested to give the
15 documentation of how many students participated in
16 the plan, that was it.
17     Q.     That is all you were asked to do?
18     A.     Yes.
19     Q.     And you did that?
20     A.     I sure did.
21     Q.     At the time that you were asked to do
22 that or you got that memo, and I know it is in here
23 someplace, at the time that you were asked to do that
24 did you ask anybody any questions about why Mr. Klunk
25 wanted that information?

1    A.      No, I was given a barrage of e-mails
2  asking about the payment plan at that time.
3    Q.      Did you go into Tom Dick's office and
4  say why do you want all of this information?  What is
5  up with this?
6    A.      No.
7    Q.      Did you go in and say this affects my
8  job?  I want to know what you want all this
9  information for?
10   A.      No.
11   Q.      Is that because typically you're not
12 consulted in those type of decisions?  The e-mail
13 that we are referring to is Deposition Exhibit 6.
14 There is a question pending.  Is that because you're
15 typically not consulted when those types of decisions
16 are typically being made or considered?
17   A.      Why would employees be consulted about
18 that?
19   Q.      Right.  Is that the deposition exhibit
20 that we were just talking about, that e-mail?
21   A.      No, this is not.
22   Q.      But that is one of them, right?  That
23 is one of the e-mails that talks about Mike Klunk and
24 requesting information?
25   A.      No, that is not the e-mail that I'm

---

1    A.      Testimony, their testimony, Barb's
2  testimony today stated that.
3    Q.      Before she testified today, how would
4  you know that?  Because this complaint as you know
5  was filed long before Barbara testified, right, and
6  this is contained in the complaint.  How did you know
7  as of the date that this was filed that she was
8  involved?
9    A.      The meeting that I was pulled in with
10 Barb and Tom to tell me that my job was going to be
11 eliminated.
12   Q.      Before or after you got the July 29th
13 letter?
14   A.      That was before the July 29th letter.
15 The July 29th letter was the official notification,
16 but I was pulled into a meeting before that.
17   Q.      How much more before that, do you know?
18   A.      It would have been either towards the
19 end of June, beginning of July, that they were
20 thinking of getting rid of my position.
21   Q.      The July 29th letter was not your first
22 notice that your position was going to be eliminated,
23 right?
24   A.      No, it wasn't.
25   Q.      Your first notice would have been at

---

72

1  talking about.
2    Q.      Okay.  What e-mail are you talking
3  about if not this one, because this is the only one
4  that so far we've seen in this lawsuit that has
5  anything to do that reflects a communication between
6  Mike Klunk and the Harrisburg office concerning the
7  payment plan?
8    A.      I didn't hear the question.
9    Q.      What e-mail or e-mails are you talking
10 about if not Deposition Exhibit 6?
11   A.      I received an e-mail from Thomas Dick
12 asking me -- that Mike Klunk wanted to know the
13 number of people in the Lancaster campus that
14 participated in the payment plan.
15   Q.      Back to my original question.  Are the
16 CEOs of other campuses part of the team that devised
17 this plan to eliminate your position?
18   A.      I can't answer that question.  I don't
19 know.
20   Q.      But you know that Tom Dick, Meredith
21 Tulli, and Barbara Hutchinson, they at least had some
22 involvement in devising a plan to eliminate your
23 position; is that right?
24   A.      Correct.
25   Q.      You know that how?

---

74

1  the end of June, early July, somewhere around there?
2  Before the holiday, do you know?
3    A.      No, I don't know.
4    Q.      At any time after you were pulled into
5  that meeting and they told you that they were
6  thinking about eliminating your position or the fact
7  that your position was being eliminated, did you
8  start looking for a job?
9    A.      No, I did not.
10   Q.      Were you thinking of a plan in terms of
11 income at that point?
12   A.      No, I didn't know because I didn't know
13 if it was going to come to pass or not.
14   Q.      Is that because they told you they were
15 thinking about doing it?
16   A.      Correct.
17   Q.      During that meeting did you ask when
18 would be the earliest that they would tell you, in
19 fact, it was going to be eliminated?  Did you want to
20 know that?
21   A.      No, I did not.  I sat and listened.
22   Q.      What were your thoughts in terms of
23 income at the time that you were hearing that your
24 position was going to be eliminated or might be
25 eliminated?  I mean, what were you thinking in terms

75

1 of employment?
2      A.      Looking for another job.
3      Q.      Within the campus or outside the
4 campus?
5      A.      Either or.
6      Q.      But you didn't start looking until
7 after October 3rd?
8      A.      No.
9      Q.      When did you start looking?
10      A.      After my job was -- in August, because
11 the job was over in August.
12      Q.      After --
13      A.      The blow up on the 22nd.
14      Q.      Were you already enrolled in classes at
15 that point for the fall semester?
16      A.      No, I was not.
17      Q.      Were you able to enroll for day classes
18 already?
19      A.      No, because the semester had already
20 started.
21      Q.      So you couldn't get any day classes.
22 Did you take night classes?
23      A.      No, I did not.
24      Q.      Did you take any classes that semester?
25      A.      No, I looked for work.

76

1      Q.      The following semester is when you
2 started to take classes?
3      A.      Yes.
4      Q.      Spring of '04?
5      A.      Spring of '04.
6      Q.      Did either -- I'm doing this so I don't
7 have to draw an objection from your counsel, but I
8 think I'm going to get it anyway because it is going
9 to be compound or something, but I'll give it a shot.
10              Did either Meredith Tulli or Barbara
11 Hutchinson do anything in the nature of repeated
12 abuse or harassment based on your race as the result
13 of either filing a PHRC complaint or expressing an
14 interest in participating in the minority caucus?
15      A.      I can't answer that question.
16      Q.      Is that because you don't know?
17      A.      I don't know.
18      Q.      Paragraph 30, page 8, you talk about
19 emotional distress. I'd like you to explain for me,
20 if you will, what emotional distress was caused by
21 whatever these folks did?
22      A.      The fact I was losing my job and I
23 didn't have benefits for my children, who both have
24 allergies. The fact I was beginning unemployed for
25 something I didn't do. The fact that my job was

77

1 taken away from me and given to another employee in
2 the office when I was the lead on that job to begin
3 with.
4              Being screamed at and blocked or
5 prevented from leaving the office the way I was by
6 Thomas Dick. Also, when Barb sent out that e-mail to
7 other employees to let them know that I was the
8 reason that nobody would be able to take classes, the
9 backlash I had from the other employees. That is all
10 I can think of at this time.
11      Q.      With respect to the first couple of
12 things you mentioned, losing your job for something
13 you didn't do -- I can't remember what they are off
14 the top of my head. I'm going to ask the court
15 reporter to read them back, just the first three
16 things that she mentioned.
17              THE REPORTER: "ANSWER: The fact I was
18 losing my job and I didn't have benefits for my
19 children, who both have allergies. The fact I was
20 being unemployed for something I didn't do. The fact
21 that my job was taken away from me and given to
22 another employee in the office when I was the lead on
23 that job to begin with.
24              Being screamed at and blocked or
25 prevented from leaving the office the way I was by

78

1 Thomas Dick. Also, when Barb sent out that e-mail to
2 other employees to let them know that I was the
3 reason that nobody would be able to take classes, the
4 backlash I had from the other employees. That is all
5 I can think of at this time."
6 BY MS. O'DONNELL:
7      Q.      You said emotional distress. I'm going
8 to ask you to describe your emotions. Losing your
9 job?
10      A.      Anger.
11      Q.      No benefits for your children's
12 allergies?
13      A.      Probably anger, also.
14      Q.      Unemployment for something you didn't
15 do?
16      A.      Anger.
17      Q.      Job taken away and given to an employee
18 when you were the lead on that job to begin with?
19      A.      Anger.
20      Q.      Being screamed at or blocked or
21 prevented from leaving the office the way you were by
22 Tom Dick?
23      A.      Threatened and humiliated.
24      Q.      And the backlash from the other
25 employees because of Barb's e-mail?

79

81

1   A.   Humiliation.

2   Q.   Now, did your anger prevent you from

3 engaging in your daily activities?  Did it interfere

4 with your ability to work or to function?

5   A.   No, it did not.

6   Q.   The fact that you were threatened or

7 humiliated when you were screamed at and blocked from

8 leaving the office, did that prevent you from being

9 able to function physically, conduct your daily

10 activities the way you normally would?

11   A.   Do you mean at work or at home?

12   Q.   Anywhere?

13   A.   Rephrase that for me.

14   Q.   Sure.  The fact you said you felt

15 threatened and humiliated by Tom Dick when he

16 screamed at you and he blocked or prevented you from

17 leaving.

18   A.   Correct.

19   Q.   My question is:  Were you unable -- did

20 that feeling of being threatened and feeling of being

21 humiliated interfere with your ability to function

22 either at work or at home?

23   A.   It didn't interfere at home and I was

24 never allowed back in the office again so it couldn't

25 affect work because I was never allowed back in

1 document that has already been marked Deposition

2 Exhibit 13 and it is a production of the Defendants

3 and it has been Bate stamped 6, 7 and 8.  It is

4 entitled open jobs from June 1, 2003 to December 31,

5 2003.  Tell me, Ms. Ellis, if you've seen that before

6 today?

7   A.   No, I have not.

8   MR. ARCHER:  Off the record.

9   (At this time there was a brief

10   discussion held off the record.)

11 BY MS. O'DONNELL:

12   Q.   You say that you've never seen that

13 before today?

14   A.   No, I have not.

15   Q.   Now, I'd like you to take a look at

16 that three-page document that we've marked as

17 Deposition Exhibit No. 13.  Can you tell me whether

18 you applied for or expressed an interest in any of

19 those positions on the three pages that are in front

20 of you at any time in 2003 to the best of your

21 recollection?

22   A.   I did apply for a job with registration

23 technician position.  What the name of the position

24 was -- this does not breakdown where these jobs are

25 located.

80

82

1 there.

2   Q.   Lastly, your feeling of humiliation

3 from the backlash by other employees when Barb

4 circulated that memo, did that interfere with your

5 ability to function in any way?

6   A.   No, it did not.

7   MR. ARCHER:  Are you talking about

8 ever, from that day forward or just at the time it

9 happened?

10   MS. O'DONNELL:  She can answer it

11 however she pleases.

12   MR. ARCHER:  I'll ask her one more time

13 if she meant --

14   MS. O'DONNELL: I'll ask her.

15   MR. ARCHER:  Go ahead.

16 BY MS. O'DONNELL:

17   Q.   How long after that incident would it

18 have affected your ability to function?

19   A.   The backlash lasted for a week to two

20 weeks from the other employees, but I didn't let it

21 deter me from doing my job.

22   Q.   Did it affect you at home at all?

23   A.   No.

24   Q.   I want to go over with you some

25 documents and then we will be finished.  This is a

1   Q.   Assuming you've got that obstacle to

2 overcome, can you tell me whether you expressed an

3 interest in any other positions other than the one in

4 registration that you testified about?

5   A.   I applied for other positions.  I can't

6 remember.  I think the second is a secretarial

7 position.

8   Q.   In 2003?

9   A.   Quite possibly, yes.

10   Q.   Were you qualified, underqualified,

11 overqualified for that secretarial position?

12   A.   I would be qualified.

13   Q.   Would it have paid as much money as you

14 were making in finance?

15   A.   It could have paid more, less, I don't

16 recall.

17   Q.   Do you know whether that application

18 would still be on file at HACC if you did, in fact,

19 apply for it?

20   A.   If they still retain that information.

21   Q.   You just don't know one way or the

22 other?

23   A.   No, I do not.

24   Q.   Do you need more time to look at that

25 list or was that all of the applications you made to

1  the best of your knowledge as you sit here today?

2      A.      I can't recall.  I had applied to other

3  positions at the College, but I can't recall what

4  they are at this time.

5      Q.      That is all I'm asking, just what you

6  recall.  I'm going to show you a document that has

7  been Bate stamped 9, again, my production.  Tom, I

8  don't think this has been previously marked, but if

9  you would like to go through the pile to double-check

10  you can do that.

11              MR. ARCHER:  I don't think this was.

12  BY MS. O'DONNELL:

13      Q.      I gave you a pile of documents so you

14  have it to refer to.  It is a document Bate stamped

15  No. 9., do you see that?

16      A.      Yes.

17      Q.      Have you seen that document before

18  today?

19      A.      Yes.

20      Q.      What is this document?

21      A.      It is the posting for the Specialist II

22  in Enrollment Services.

23      Q.      Who oversees Enrollment Services?

24      Q.      Higher up, supervisory position, what

25  do you mean?

---

84

1      Q.      Tell me first the supervisory position

2  and to the extent you know the chain of command you

3  can tell me that?

4      A.      The position underneath Tisa.

5      Q.      Tisa Riley?

6      A.      Tisa Riley.

7      Q.      There is a handwritten notation in the

8  upper right-hand corner, do you see that?

9      A.      Posted 06/02/03?

10      Q.      Yes.  It says internal position

11  announcement.  Do you see that in the upper left

12  corner?

13      A.      Yes, I do.

14      Q.      What does that mean internal position

15  announcement?

16      A.      That means they already know who they

17  want the position to go to.

18      Q.      How do you know that?

19      A.      That is how they do that.

20      Q.      At that point, do you know who that

21  person was that they wanted that position to go to?

22      A.      They wanted me to apply for this

23  position.

24      Q.      And did you?

25      A.      I didn't want to apply for that

---

1  position.  I eventually did, but I didn't want to.

2      Q.      Why didn't you want to apply for this

3  position?

4      A.      I wasn't interested in working for

5  Enrollment Services.

6      Q.      Did you eventually have an interview

7  scheduled?

8      A.      Yes.

9      Q.      If you look at documents Bate stamped

10  11 and 12, I'm not going to ask you whether or not

11  you've ever seen those documents before today, but

12  I'm going to draw your attention to a document Bate

13  stamped 11 and tell me whether to your recollection

14  you had an interview scheduled on September 4th, 2003

15  with Bill Holloway and Tisa Riley?

16      A.      Correct.

17      Q.      Did you go to that interview?

18      A.      Yes, I did.

19      Q.      Was this for the same position that we

20  just looked at?

21      A.      Yes.

22      Q.      Did you tell them you were interested

23  or not interested in the position at that point?

24      A.      I told them that all I remember in the

25  interview is Tisa asking me what do I see myself

---

86

1  doing in five years and I responded that I see myself

2  not working at this campus and finding employment

3  within the field of my degree.

4      Q.      That is criminal justice?

5      A.      Correct.

6      Q.      I'm going to draw your attention to a

7  document Bate stamped 12.  If you come down to your

8  name it says rescheduled, Friday 8:30.  Do you see

9  that?

10      A.      Yes.

11      Q.      Do you know whether or not your

12  interview was rescheduled to the next day on

13  September 5th?

14      A.      I don't recall.

15      Q.      Would this have been after August 25th,

16  that meeting with Meredith Tulli?

17      A.      The interview was after the meeting

18  with her, yes.

19      Q.      You were not working at HACC but you

20  were being interviewed for a position at HACC --

21      A.      Yes.

22      Q.      -- on September 5th of 2003.  To the

23  best of your knowledge they wanted you to take this

24  position?

25      A.      Not at that time, that is not to my

1 knowledge.
2      Q.      Is that based on an internal posting or
3 some other posting?
4      A.      No, this was an external posting.
5      Q.      This was the external posting which
6 means they opened it up to everybody and not just
7 you?
8      A.      Correct.
9      Q.      At the time that you interviewed with
10 Tisa Riley and Bill Holloway you told them you would
11 like to be in a job that has to do with your major
12 which is criminal justice?
13      A.      Correct.
14      Q.      Is there anything else about that
15 interview that you remember that was significant?
16      A.      No, those are the reasons why I did not
17 choose to apply for that position.
18      Q.      But you were interviewing for the
19 position, you had gone beyond applying, right?
20      A.      There were other reasons why I did not
21 want to take that position.
22      Q.      What were the other reasons?
23      A.      There was a previous employee named Amy
24 Gresh and she worked for Gilda Bond (sic) who was in
25 George Franklin's capacity.  She got into a

1 disagreement with him, he ended up putting her in the
2 book store, working in the book store, she was never
3 shown her duties and told what she was supposed to be
4 doing and she ended up fired and filed a civil
5 complaint against HACC, also.
6              I felt with me being placed in
7 Enrollment Services in a field that I would have no
8 expertise in that eventually I would be ultimately
9 fired from this position, just to not have me fired
10 from Student Accounts to have me fired in another
11 position within the campus.  I just felt this job was
12 not going to pan out for myself.  Eventually, there
13 would have been a reason for them to let me go from
14 the College.
15      Q.      When you initially talked to Tisa Riley
16 on the telephone about the position before it was
17 internally posted did you express to her an interest
18 in the position?
19      A.      I told her I was interested, but I had
20 doubts about the job, too.
21      Q.      Do you recall the conversation, what
22 doubts you articulated to Tisa at that time?
23      A.      No, I did not.
24      Q.      Did you say Tisa this is just another
25 recipe for failure, I don't want to take the

1 position?
2      A.      Another doubt that I had was the
3 position was created out of another black woman's
4 position.  She was the only black woman that was in
5 that office.
6      Q.      Is this Amy Gresh?
7      A.      No, this is Stephanie Davis.  She ended
8 up being fired from her position, also.  She had
9 previously filed a complaint with Human Relations
10 about them.  She had come to me and talked to about
11 how she was being treated differently because she was
12 the only black employee in that job, they took her
13 position and upgraded it and then wanted me to take
14 it and I had very strong doubts about this job.
15      Q.      Is Amy Gresh, white, black, something
16 else?
17      A.      White.
18      Q.      Stephanie Davis you're saying that
19 Stephanie was ultimately removed from the position,
20 they upgraded it and wanted to give it to you?
21      A.      Yes.
22      Q.      Stephanie was black?
23      A.      Yes, she was.
24      Q.      What did Stephanie do after she left
25 that position and it was upgraded?

1      A.      I don't know what Stephanie did after
2 she left HACC.
3      Q.      Was her position revised in some way?
4      A.      They took her position.  She was a
5 registration clerk, they took her position and
6 upgraded it to this position.
7      Q.      I'd like you to flip to the next page,
8 please.  It is Bate stamped 16.  Have you seen this
9 document before today?
10      A.      I created it.
11      Q.      What is it?
12      A.      It is my resume.  It is a cover letter
13 for my resume.
14      Q.      Is this an application for a position?
15      A.      Yes.
16      Q.      What is the date of the application?
17      A.      July 21st, 2003.
18      Q.      To whom is it directed?
19      A.      Tisa Riley.
20      Q.      Director of Enrollment Services?
21      A.      Correct.
22      Q.      It says, "This letter is to express my
23 interest in joining your department as a Technician
24 II."
25      A.      Correct.

91

```
1      Q.      Are you saying even though you applied
2  for this position and sent a letter of interest you
3  really were not interested?
4      A.      No, I really was not interested.
5      Q.      Documents Bate stamped 17 and 18, have
6  you seen those documents before today?
7      A.      Yes.
8      Q.      What are they?
9      A.      That is my resume.
10     Q.      Is that something that you provided to
11 Tisa Riley for her consideration?
12     A.      Correct.
13     Q.      And is that for consideration for your
14 hire for the position of Technician II?
15     A.      Correct.
16     Q.      Next document I'm showing you is that
17 which has been Bate stamped 22, but has been
18 previously marked Deposition Exhibit 9.  Do you see
19 that?
20     A.      Yes.
21     Q.      Is this the July 29th letter that you
22 received from Meredith Tulli with a copy to Tom Dick
23 and Barbara Hutchinson advising that your position
24 was being eliminated October 3, 2003?
25     A.      Correct.
```

92

```
1      Q.      And so I understand your testimony
2  about a month prior to this you were first advised
3  informally that they were thinking of eliminating
4  your position?
5      A.      I can't say it was a month before.  I
6  was advised they were looking to do that, yes.
7      Q.      And I think it was your testimony it
8  was sometime at the end of June, early July?
9      A.      Correct.
10     Q.      The next document is Bate stamped 27,
11 dated October 15th, 2003.  Do you see that?
12     A.      Yes.
13     Q.      Did you receive that letter from
14 Meredith Tulli?
15     A.      Yes, I did.
16     Q.      And it states, ""Please make
17 arrangements to return office keys and employee ID
18 card."  Do you see that?
19     A.      Yes.
20     Q.      And you hadn't done that prior to this
21 date of October 16th?
22     A.      I wasn't asked to.
23     Q.      Is that the only reason you didn't
24 return those items is because you weren't asked to?
25     A.      I didn't think about it.
```

93

```
1      Q.      I'm going to skip over 65 and 66.  The
2  next document I'd like you to take a look at is Bate
3  stamped 67.  Do you see that?
4      A.      Yes.
5      Q.      Is that a letter -- pardon me -- a memo
6  to you from the president of HACC?
7      A.      Yes.
8      Q.      Dated June 16th, 2003?
9      A.      Correct.
10     Q.      Subject 2003-2004 salary increase.  Do
11 you see that?
12     A.      Yes.
13     Q.      And it states that your annual salary
14 has been increased by 3.9 percent to $26,452
15 effective July 1, 2003?
16     A.      Correct.
17     Q.      And is that notwithstanding that you
18 did not receive a performance evaluation that year?
19     A.      Correct.
20     Q.      The next document is Bate stamped 69.
21 Do you see that?
22     A.      Yes.
23     Q.      Can you tell me what that is?
24     A.      It is a salary increase.
25     Q.      For the year 2002-2003?
```

94

```
1      A.      Yes.
2      Q.      It is a letter from the president of
3  HACC directed to you dated April 26th, 2002?
4      A.      Yes.
5      Q.      And can you just for the record tell us
6  what the increase was by percentage and to what
7  amount?
8      A.      Four percent to the amount to $27,717.
9      Q.      Effective when?
10     A.      July 1st, 2002.
11     Q.      Is that notwithstanding that you did
12 not receive a performance evaluation?
13     A.      Correct.
14     Q.      Next is Bate stamped 71.  Do you agree
15 with me for the sake of expediency that this is
16 another letter from the president of HACC directed to
17 you and dated May 10, 2001 regarding your salary
18 increase for the year 2001-2002?
19     A.      Correct.
20     Q.      Would you tell me what your salary had
21 been increased to?
22     A.      $23,766.
23     Q.      Effective when?
24     A.      July 1 of 2001.
25     Q.      And is that notwithstanding the fact
```

95

1  that you did not receive a performance evaluation
2  that year?
3       A.      Correct.
4       Q.      The next document has been Bate stamped
5  77.  Do you see that?
6       A.      Yes.
7       Q.      And would you agree with me that this
8  is a letter from the president of HACC dated May
9  15th, 2000 directed to you?
10      A.      Yes.
11      Q.      Will you also agree with me that as a
12 result of the Board's actions your salary had been
13 increased from $22,511 to $23,186 effective July 1 of
14 2000?
15      A.      Yes.
16      Q.      Is that notwithstanding that you did
17 not receive a performance evaluation that year?
18      A.      Correct.
19      Q.      Next is Bate stamped 78, do you see
20 that?
21      A.      Yes.
22      Q.      Will you agree with me this is a letter
23 from Edna Baehre, Director of HACC, directed to you
24 dated May 20th, 1999?
25      A.      Yes.

97

1       Q.      Can you tell me what this memo says?
2       A.      That the Board has met and they've
3  officially hired me into the position as an
4  Accounting Clerk I.
5       Q.      July 7th, 1998; is that correct?
6       A.      That is correct.
7       Q.      And from document Bate stamped 93
8  through 95 is this the resume that you submitted when
9  you applied for the Accounting Clerk I position?
10      A.      Correct.
11      Q.      Document Bate stamped 107 through 110,
12 I'll state for the record is the administrative
13 procedure 875 regarding harassment.  Did I read that
14 correctly?
15      A.      Yes.
16      Q.      Have you seen this document before
17 today?
18      A.      No, I have not.
19      Q.      Did you know whether or not Harrisburg
20 Area Community College had an administrative policy
21 regarding harassment?
22      A.      No, I did not.
23      Q.      Did you ever discuss whether or not the
24 College had a policy regarding harassment with
25 anybody in the minority caucus group?

96

1       Q.      It indicates your salary had been
2  increased from $21,322 to $22,511 effective July 1 of
3  1999?
4       A.      Yes.
5       Q.      And you did, in fact, receive a
6  performance evaluation that year?
7       A.      Correct.
8       Q.      And the document that follows has been
9  Bate stamped 79 through 82.  We previously marked
10 this as Deposition Exhibit No. 3.  Is this your 1999
11 performance review?
12      A.      Correct.
13      Q.      Is this what we referenced in the
14 complaint as your exemplary performance review?
15      A.      Correct.
16      Q.      The document is Bate stamped 1983. Do
17 you recall receiving this document before today?
18              MR. ARCHER:  Bate stamped what?
19              MS. O'DONNELL:  83.
20              THE WITNESS:  Correct.
21 BY MS. O'DONNELL:
22      Q.      It is a memo from Beverly Spoerl,
23 S-p-o-e-r-l, directed to you, dated July 17th, 1998
24 and the subject is personnel recommendations?
25      A.      Correct.

98

1       A.      No, I did not.
2       Q.      Did you ever discuss with anyone in
3  your department or anyone within the chain of command
4  over your department whether or not Harrisburg Area
5  Community College had a policy regarding harassment?
6       A.      No, I did not.
7       Q.      Did you ever discuss with any of your
8  co-workers or colleagues, student colleagues, whether
9  or not the policy -- pardon me -- whether or not
10 Harrisburg Area Community College had a policy
11 regarding harassment?
12      A.      No, I did not.
13      Q.      Did you take any courses while you were
14 at HACC that dealt with race and racial bias?
15      A.      Not at HACC.
16      Q.      Did you take it at Albright College?
17      A.      No, I did not.
18      Q.      Did you take it somewhere else?
19      A.      Penn State.
20      Q.      Was this before or after your complaint
21 was filed?
22      A.      Before.
23      Q.      Did you know that companies and, for
24 example, colleges and school districts typically do
25 as a matter of course have policies regarding

99

1  harassment?
2      A.    No, I did not.
3      Q.    Document Bate stamped 111 through 113,
4  I'll state for the record this is the Harrisburg Area
5  Community College's Administrative Procedure 887
6  regarding grievance procedures for faculty and staff.
7  Do you see that?
8      A.    Yes, I do.
9      Q.    Did you know there was a grievance
10 procedure in place for faculty and staff while you
11 were employed at HACC?
12     A.    I did know there was a previous
13 procedure, yes.
14     Q.    You did?
15     A.    Yes, I did.
16     Q.    Did you utilize the grievance procedure
17 for any abuse or harassment or threats or humiliation
18 that you felt you were undergoing by Thomas Dick,
19 Meredith Tulli, or Barbara Hutchinson while you were
20 employed there?
21     A.    No, I did not.
22     Q.    Did you have a meeting with Edna Baehre
23 regarding your inability to take classes?
24     A.    Yes, I did.
25     Q.    Did you advise Edna Baehre you were the

100

1  subject of racial discrimination because you couldn't
2  take classes?
3      A.    Yes, I did.
4      Q.    What did she say?
5      A.    She would look into it.
6      Q.    Do you know whether or not she made a
7  determination that white people were allowed to take
8  classes?
9      A.    I don't know.
10     Q.    Do you know if anyone ever made a
11 finding that white students could take classes when
12 black students could not?
13     A.    No, I do not.
14     Q.    The next document is a document you
15 produced to us, your attorney produced to us and it
16 was Bate stamped 190 and previously marked as
17 Deposition Exhibit 4. Have you seen this before
18 today?
19     A.    Yes, I have.
20     Q.    Can you tell us what this is?
21     A.    A letter from Dr. Baehre stating that
22 they were creating a task force to work on the
23 evaluation process.
24     Q.    Does it also state as for a certain
25 period of time you would not receive a performance

101

1  evaluation while the task force is developing
2  recommendations?  Look down at the very paragraph
3  that is in bold where it says during this interim
4  period.  Do you see that?
5      A.    Yes, I see that.
6      Q.    Did that apply to your employment at
7  HACC?
8      A.    Yes, it did.
9      Q.    Next document is bate stamped 0 and 1.
10 Have you seen these pages before today?
11     A.    Yes, I have.
12     Q.    Would you identify for the record what
13 this is?
14     A.    It is my resume.
15     Q.    Is this your current resume?
16     A.    Yes, it is.
17     Q.    Is this the resume that you used in
18 order to find a job with state government?
19     A.    Yes, it is.
20     Q.    The document Bate stamped 48, have you
21 seen this document before today?
22     A.    Yes, I have.
23     Q.    Can you tell us what that is?
24     A.    It is a W-2.
25     Q.    Is that an accurate reflection of the

102

1  wages that you made in 2005?
2      A.    Yes.
3      Q.    And for the record that number is
4  $31,669.43?
5      A.    Correct.
6      Q.    To the extent that you know, document
7  49 that you produced to us dated May 21st, 2003, can
8  you tell us whether you saw this document before
9  today?
10     A.    Yes, I have.
11     Q.    And this is a finding from the
12 Pennsylvania Human Relations Commission; is that
13 correct?
14     A.    Correct.
15     Q.    Do you whether that was with respect to
16 the first or second complaint that you filed?
17     A.    This would have been the first
18 complaint.
19     Q.    I'd like to skip a few documents and go
20 to a document that has been Bate stamped 239 through
21 240.  There is another page that follows that is not
22 Bate stamped and then there is a page that follows
23 that is 241.  I don't know how you want to fix that.
24 Do you want to make that 240-A, that page that is not
25 Bate stamped?

103

1       MR. ARCHER:  My copy of our production
2   has 239, 240, 241 and 242 with nothing in between.
3       MS. O'DONNELL:  Here is what I have.  I
4   have 239, 240, that, 241, 242.  That looks like it is
5   the -- I am also reviewing, it is the third page of
6   that memo.
7       MR. ARCHER:  I don't know what happened
8   there.  You can refer to it any way we want.
9       MS. O'DONNELL:  For the record, 239,
10  240 and 240-A.
11      MR. ARCHER:  So far you haven't really
12  been marking anything.
13      MS. O'DONNELL:  I'm going to go through
14  the way I referred to them and have them marked as
15  Exhibits 26 through whatever it is at the end of her
16  deposition.  I don't think Ms. Ellis wants to sit
17  through that as we mark deposition exhibits.
18  Do you want to take a break and have all these
19  marked?
20      MR. ARCHER:  No, I'm just thinking
21  outloud whether or not that will create any confusion
22  in the record because they have been not referred to
23  as any particular number.
24      MS. O'DONNELL:  The third page of the
25  memo we'll call it 240-A and from here on --

104

1       MR. ARCHER:  I guess since they are all
2   Bate stamped it is not a problem.
3   BY MS. O'DONNELL:
4       Q.      Now, Ms. Ellis, have you seen this
5   three-page document that we've now identified as 239,
6   240 and 240-A before today?
7       A.      No.
8       Q.      This is dated March 11th, 2003?
9       A.      Correct.
10      Q.      Is this the memo that you were talking
11  about that created backlash from your co-workers?
12      A.      No.
13      Q.      What is that memo?
14      A.      Office procedures from Thomas Dick.
15      Q.      Is this something that you would
16  consider abusive or harassing?
17      A.      This was just general office
18  observations that he made.
19      Q.      Is that your understanding of what this
20  memo is?  Do you want to take time to read it again?
21  I'm sure you read it before, but if you want to
22  refresh your recollection I'll give you time to read
23  it.
24      A.      Okay.
25      Q.      Let me draw your attention to the last

105

1   page, 240-A, the second full paragraph that begins
2   the payment plan.  Do you see that?
3       A.      Yes.
4       Q.      It says the payment plan has been
5   purchased which will continue to increase our revenue
6   based through the payment of application fees.  Do
7   you see that?
8       A.      Yes.
9       Q.      As of March 11th, 2003, did you have a
10  conversation with Tom Dick about whether or not to
11  purchase the forms?
12      A.      Say that again.
13      Q.      As of the date of this memo that you
14  received sometime on that date or after that date,
15  did you have a conversation with Tom Dick about
16  ordering the forms for the payment plan?
17      A.      I don't recall the exact date.
18      Q.      Do you recall whether it was after this
19  date?
20      A.      I don't recall.
21      Q.      The very last paragraph reads, "Many of
22  the processes in the College are being evaluated by
23  outside consultants and internal process mapping
24  committees as processes needing to be changed.  The
25  student accounts and cashiering processes have not

106

1   been selected for review.  This doesn't mean that we
2   can't make improvements in our processes and provide
3   increased customer service to our students.  Everyone
4   needs to be open to review job duties so we can
5   continue to move forward and use our resources in the
6   most efficient manner."  Did I read that correctly?
7       A.      Yes.
8       Q.      At any time were you asked to provide a
9   list of your job duties?
10      A.      We were asked to update our job
11  descriptions, list any additional jobs that we did
12  compared to what the job descriptions that were
13  currently written.
14      Q.      Is that after you received this memo?
15      A.      Don't know.
16      Q.      The next document is Bate stamped 241.
17  Do you see that?
18      A.      Yes.
19      Q.      Is that an e-mail from Tom Dick to you
20  dated September 18th to '02?
21      A.      Right.
22      Q.      And it says job description payment
23  plan?
24      A.      Correct.
25      Q.      Does that refresh your recollection as

109

1  to when you were asked to do a job description for a
2  payment plan processing?
3        A.       Say that again?
4        Q.       Does this refresh your recollection as
5  to when Tom Dick would have asked you to provide your
6  job description for payment plan processing or your
7  job description at all?
8        A.       Yes.
9        Q.       Do you recall whether or not you gave
10 it to him in a timely fashion?
11       A.       If he asked for it by Friday, I gave it
12 to him by Friday.
13       Q.       The next document is Bate stamped 242.
14 Do you see that?
15       A.       Yes.
16       Q.       Did you receive a copy of that e-mail
17 before looking at it today?
18       A.       Yes.
19       Q.       It is dated November 11th, 2002 from
20 Tom Dick; is that correct?
21       A.       Yes.
22       Q.       The subject matter is performance
23 evaluations.  Do you see that?
24       A.       Yes.
25       Q.       Are those all of the persons that work

1  or this letter?
2        A.       They wanted clarification.
3        Q.       About?
4        A.       What was going to happen.
5        Q.       Did you receive clarification after
6  providing this letter or memo to them?
7        A.       I don't think I received clarification.
8        Q.       Now, in the second paragraph you
9  indicate also in the meet I was told that you are not
10 looking to phase out my position until October.  It
11 has come to my attention that the branch campuses are
12 to start being trained on how to use the monthly
13 payment plan within the next two weeks.  Does this
14 mean I am going to be forced out before October?
15 Your next question is:  If I am to be forced out
16 sooner than October will I be receiving my evaluation
17 before I go.  Do you see that?
18       A.       Yes.
19       Q.       What was the purpose of your question
20 to them asking whether you're going to be forced out
21 before October even though they told you your
22 position would not be phased out until October?
23       A.       Because they were already making
24 arrangements to move the payment plans out to the
25 other campuses.

108

1  with you in your department to whom that e-mail has
2  been directed?
3        A.       Yes.
4        Q.       Does this indicate you would not be
5  receiving a performance evaluation in 2002, that
6  those evaluations would be postponed until April of
7  '03?
8        A.       Correct.
9        Q.       The next document that I would like you
10 to take a look at, Ms. Ellis, is stamped 245.  Have
11 you seen this document before today?
12       A.       Yes.
13       Q.       And what is it?
14       A.       A letter to Barb, Tom and Meredith.
15       Q.       From you?
16       A.       Yes.
17       Q.       And it is dated July 9th, 2003?
18       A.       Correct.
19       Q.       Is that before or after you sat down
20 with them regarding the meeting that they indicated
21 that your job might be eliminated?
22       A.       It is dated on the 3rd of July, they
23 told me they were looking to branch out the monthly
24 payment plan.
25       Q.       And what was the purpose of this memo

110

1        Q.       Was it just to get some confirmation
2  that your position would not be ending until October
3  and not before then?
4        A.       Yes.
5        Q.       You wanted to know whether you would
6  get your evaluation because you really wanted to know
7  whether you were going to get a raise?
8        A.       No, everybody else was evaluated and I
9  wanted to know why I wasn't.
10       Q.       Did it occur to you that you might not
11 be getting evaluated because that position was being
12 eliminated?
13       A.       No.  Everybody's was due in July and I
14 should have gotten one, too, I worked that whole year
15 and I should have got an evaluation.
16       Q.       But there is no question that you got a
17 raise?
18       A.       No, it's been documented.
19       Q.       Look at document Bate stamped 250,
20 please.  Have you seen this e-mail before today?
21       A.       Yes.
22       Q.       For the record, it is an e-mail from
23 Thomas Dick to Darla Ellis dated 12/19/02 regarding
24 books for spring.  Did I read that correctly?
25       A.       Yes.

111

1    Q.      Just summarize briefly for me in your
2  words what this e-mail is about?
3    A.      This is what he was requiring me to
4  sign a form to be able to get my books that I would
5  agree to the book store testing before I would be
6  allowed to get my books which was never done before.
7    Q.      It's says in the second paragraph from
8  Tom Dick at 10:30 a.m., would you be acceptable to
9  sign a modified testing form for the testing of the
10  book store feed only.  You can then get your books
11  for spring before we leave for break.  Only the book
12  store feed would be tested.  Barry would do the
13  testing.  No other charges, credits, etc., would be
14  applying to your account.  Then he goes on to suggest
15  to --
16    A.      Yeah.
17    Q.      Where is he forcing you to sign a
18  permission slip.  Doesn't it start out would you be
19  acceptable to sign?
20    A.      I never had been requested before to
21  allow them access to my account to be able to get my
22  book for any of the previous six semesters that I did
23  school.
24    Q.      They are doing testing, right?
25    A.      Yes, and they already used my account

112

1  without my permission and I was not happy with that.
2    Q.      I understand that.  This is with your
3  permission and it is for modified testing, right?
4    A.      Only reason why I did it was because I
5  wanted my books to get a jump on the semester and
6  that is the only reason I agreed to it.
7    Q.      Look at document 257, please.  This is
8  an e-mail from Thomas Dick to Darla Ellis dated
9  12/13/02 at 4:37 p.m., subject tuition payment plan.
10  Have you seen this document before today?
11    A.      Yes, I have.
12    Q.      Can you tell me what essentially to the
13  best of your understanding or recollection this
14  e-mail involves?
15    MR. ARCHER:  I'm going to object to the
16  question.  It is a written document from Tom Dick
17  that speaks for itself.
18    MS. O'DONNELL:  She certainly --
19    MR. ARCHER:  Well the purpose --
20    MS. O'DONNELL:  You don't have to make
21  a speaking objection.  You made your objection.
22    MR. ARCHER:  I'm not making a speaking
23  objection.
24    MS. O'DONNELL:  I'll rephrase.
25  BY MS. O'DONNELL:

113

1    Q.      Ms. Ellis, have you seen this document
2  before today?
3    A.      Yes.
4    Q.      Did you read it?
5    A.      Now?
6    A.      No, had you read it before you received
7  it today?
8    A.      Yes.
9    Q.      Did you understand it after you read it
10  after you received it before today?
11    A.      Yes.
12    Q.      Are you able to articulate now what
13  your understanding is now of this memo?
14    A.      What do you want me to answer?
15    Q.      Are you able to articulate your
16  understanding of this memo as you sit here today?
17    A.      The memo speaks for itself.
18    Q.      Are you unable to articulate your
19  understanding of this memo as you sit here today?
20    MR. ARCHER:  You can tell her what you
21  think it is.
22    MS. O'DONNELL:  Thank you.  You now
23  have permission to testify.
24    THE WITNESS:  There was a problem with
25  the software and we had to contact Jim Henderson, he

114

1  made the software, we had to get it fixed.  Jim let
2  him know that he was looking at other payment plan
3  vendors.  He was setting up a meeting in mid January
4  to meet, saying I didn't respond to his e-mail to
5  meet him -- to have a meeting with him about the
6  software and wants to know if I want to be a part of
7  the review process.
8  BY MS. O'DONNELL:
9    Q.      Do you recall how you responded to
10  that?
11    A.      Yeah, it is in the next e-mail 258.
12    Q.      What is your response?
13    A.      I told him that I did not have time to
14  meet.  If we are under the gun to get -- the HACC
15  campus is closed down before Christmas break and so
16  every payment plan application that we received
17  before we went on break needed the attribute on it,
18  had to be entered into the system, had to have the
19  coupons issued out and mailed out of the campus
20  before we left for break.  There was no way that I
21  can sit in meetings during that time frame.
22  BY MS. O'DONNELL:
23    Q.      And the document that you're referring
24  to is Bate stamped 258?
25    A.      Correct.

```
 1   Q.   That also carried over on 259?
 2   A.   Yes.
 3   Q.   Now, document No. 277, can you tell me
 4 whether you've seen this document before today?
 5   A.   Yes.
 6   Q.   What is this memo if you've seen it
 7 before today?  Can you tell us what it is?
 8   A.   It is a letter from e-mail from
 9 minority caucus.
10   Q.   It says to go to Getachew Kassahun.
11   A.   Yes.
12   Q.   How did you get a copy of this if it is
13 not directed to you?
14   A.   He printed it and gave me a copy.
15   Q.   What does it say?  What is it telling
16 you essentially?
17   A.   That they were having a minority caucus
18 meeting and they are inviting people to come to the
19 meeting.
20   Q.   Did you express an interest in
21 attending a minority caucus meeting before September
22 23rd of 2002?
23   A.   I don't recall the dates.
24   Q.   Let me ask the question again.  Let me
25 see if I can ask it a different way.  You agree this
```

116

```
 1 is a memo that was at least printed out on September
 2 23rd, 2002?
 3   A.   Correct.
 4   Q.   The meeting was scheduled for September
 5 26th, 2002?
 6   A.   Correct.
 7   Q.   If you got this from him it had to be
 8 printed out at least on September 23rd, 2002?
 9   A.   Correct.
10   Q.   Is it fair to say that at least on
11 September 23rd or before you would have been talking
12 to him about attending a meeting?
13   A.   It could have been longer before that.
14 I can't give you a time frame as to when I talked to
15 him about the minority caucus.  It could have been a
16 year before that.  I don't remember.
17   Q.   The next document is Bate stamped 278.
18 Do you see that?
19   A.   Yes.
20   Q.   What is this document?
21   A.   That is another meeting about minority
22 caucus.
23   Q.   At that point in time would you have
24 been a member of the minority caucus?
25   A.   I never was a member of the minority
```

```
 1 caucus.
 2   Q.   How did you get this e-mail?
 3   A.   I don't know if he printed it out and
 4 gave it to me or if another employee gave it to me.
 5 I don't know if I was in that group before HACC MC --
 6   Q.   Does that mean HACC minority caucus?
 7   A.   Yes.
 8   Q.   You don't know if you were?
 9   A.   No, I never joined the minority caucus.
10 I've never been a member.
11   Q.   Did you ever attend a meeting?
12   A.   Never allowed to.
13   Q.   What if these were being held, it says
14 at noon, right?
15   A.   Yes.
16   Q.   Did you ask to go to one of these
17 minority caucus meetings at noon ever?
18   A.   No, we were not allowed to attend
19 anything like that, whether it was on our lunch hour
20 or not.
21   Q.   277 is the minority caucus meeting
22 being held 12 to 1 on September 26th, 2002.  Is it
23 your testimony that you did or did not ask to attend
24 this minority caucus meeting, to ask anyone within
25 the department whether you were permitted to attend?
```

118

```
 1   A.   I did not attend that meeting.
 2   Q.   Did you ask if you could?
 3   A.   I don't recall, but I did not recall
 4 any of the meetings.
 5   Q.   I understand that you did not attend
 6 any meetings and I understand your testimony that you
 7 were not a member, we have that clear.  My question
 8 now is did you ask anybody in a supervisory position
 9 over you whether you could?
10   A.   I do not recall.
11   Q.   Would that be true of the notice that
12 is Bate stamped 279 from Helen Wallace, it says
13 classified employee listing, next counsel meeting
14 October 9th, 2002.  Do you see that?
15   A.   Yes.
16   Q.   Did you attend a counsel meeting?
17   A.   No, we weren't allowed to attend.
18   Q.   Did you ask anyone whether or not you
19 could?
20   A.   No, at one time we were allowed and
21 they took it away and I didn't ask if I could attend.
22   Q.   At one time you were allowed and they
23 took it away?
24   A.   At one time employees were allowed in
25 our division and then it was taken away.
```

119

1    Q.    When were you allowed?

2    A.    I don't know.  I don't recall the

3 dates.  I don't recall the times, but I did not

4 attend that meeting.

5    Q.    When was it taken away?

6    A.    I don't recall the dates.

7    Q.    Next document is Bate stamped 281.

8 This is another notice of a minority caucus meeting.

9 Is it fair to assume that you did not go to this?

10    A.    Yes, it is fair to assume that.

11    Q.    And the meeting is scheduled from 12 to

12 1?

13    A.    Yes.

14    Q.    Did you ask anyone whether or not you

15 could attend?

16    A.    No, I did not.

17    Q.    Next is Bate stamped 315, e-mail from

18 Darla Ellis to James Hartman dated August 23, 2002 at

19 8:34 a.m. and the subject is Professor Hartman.  Is

20 it fair to say, Ms. Ellis, for the sake of expediency

21 that you're withdrawing from Professor Hartman's

22 class and this is your notice to him that you are

23 withdrawing from Accounting 200 class at 10:20,

24 Monday, Wednesdays, and Fridays?

25    A.    Yes, I was written up and told I had to

120

1 withdraw from those classes.

2    Q.    Was there a policy in place in your

3 department or rule in place at your department that

4 employees were not allowed to take classes during the

5 day?

6    A.    There was a rule in place, but that

7 rule does not cover your lunch hour.  Your lunch hour

8 is your lunch hour?

9    Q.    Was yours at 10:20, Monday, Wednesday

10 and Friday?

11    A.    That is the time I requested.

12    Q.    Did you get it?  Were you granted that

13 request?

14    A.    I was never denied it.  Until they

15 found out I was taking classes, I was never denied

16 that lunch hour.

17    Q.    Who did you make that request to?

18    A.    Tom Dick and Lori Amspacher.

19    Q.    Was it in writing?

20    A.    Yes, it was.  It was an e-mail.

21    Q.    You sent them an e-mail asking whether

22 it would be okay if you took your lunch hour at

23 10:20?

24    A.    Monday, Wednesday, and Friday.

25    Q.    And they didn't respond to it?

121

1    A.    I did not get a response until they

2 found out I was in classes.

3    Q.    Before or after you sent that e-mail

4 did you learn of the rule whether employees in your

5 department were not allowed to take classes during

6 the day?

7    A.    Yes, I did.

8    Q.    Before or after?

9    A.    It was before.

10    Q.    Before you sent the e-mail asking

11 permission to have your lunch hour at 10:20 you knew

12 there was a rule in place saying that employees

13 within your department do not take classes during the

14 day?

15    A.    During the day, but I did not specify

16 during my lunch hour.

17    Q.    Is that the only class that you had

18 scheduled -- that you had already taken that semester

19 that you had to withdraw from?

20    A.    Say that again.

21    Q.    Was that the only class you took during

22 the day that you had to withdraw from at that point?

23    A.    Yes, it was.

24    Q.    I'd like you to take a look at document

25 381, that is bate stamped.  Have you seen this

122

1 document before today?

2    A.    What is the blacked out portion?

3    Q.    I was going to ask you that because

4 that is the way it was produced to us.

5    A.    I seen the e-mail before, but I don't

6 know what the blacked out portion is.

7    MS. O'DONNELL:  Tom, can you find the

8 original so we can see whether or not that is

9 actually a color that we can read through.

10    MR. ARCHER:  Off the record.

11    (At this time there was a brief

12 discussion held off the record.)

13    MR. ARCHER:  This appears to be the

14 only copy that we have in the building.  We just went

15 through, understanding our stuff upstairs is loose,

16 so that is not any different from the one that you

17 have there.

18    MS. O'DONNELL:  Can you read any of

19 this, Tom?

20    THE WITNESS:  All I can see is

21 something that appears we are discouraging employees

22 --

23    MS. O'DONNELL:  From taking classes

24 blah, blah, blah.  Seems to me that the lunch hour is

25 their's to be able to do with what they want, blah,

123

1 blah, blah.  Appears to be discouraging continuing
2 education whether credit -- I can't read any of that
3 -- is job related.  I think this is particularly true
4 for single parents and -- I can't read anything else
5 on that line.  The something or at the -- I don't
6 know.  Next sentence would be even or evening
7 attendance and then nothing until administrative
8 extension to take a known time course seems
9 inconsistent with the philosophy of an educational
10 institution, blah, blah, blah, consistency across the
11 institution.  I mean is that the best we have here?
12                 MR. ARCHER:  That is the best we have.
13                 MS. O'DONNELL:  Is that what you can
14 read or can you read more?
15                 MR. ARCHER:  I don't know that I can
16 read more than that.
17 BY MS. O'DONNELL:
18         Q.         Ms. Ellis, do you know who Doug Hargis
19 is?
20         A.         Ombudsman.
21         Q.         For whom?
22         A.         For HACC.  He's one of the ombudsman
23 for the College.
24         Q.         Did you present an issue to Douglas
25 Hargis?

124

1         A.         Yes, I did.
2         Q.         Do you know whether or not he wrote
3 this on your behalf?
4         A.         He wrote that to Meredith Tulli and
5 George Franklin.
6         Q.         Regarding employees taking classes
7 during working hours?
8         A.         Yes.
9         Q.         Do you know why this was not directed
10 to Barbara Hutchinson?
11                 MR. ARCHER:  Objection.  There is no
12 way she can testify as to why Mr. Hargis sent this to
13 who he did.
14 BY MS. O'DONNELL:
15         Q.         Ms. Ellis, you testified previously
16 that Mr. Hargis wrote this on your behalf?
17         A.         Yes.
18         Q.         Did you ask him to direct this e-mail
19 or direct this communication to Meredith and George?
20         A.         No, I did not.
21         Q.         Did you ask him to direct the
22 communication to anyone?
23         A.         No, I did not.
24         Q.         What was the substance of your
25 conversation with Mr. Hargis when you brought this to

125

1 his attention?
2         A.         I went in and explained my whole
3 situation from the day I set foot at HACC, I was
4 never allowed to take classes.
5         Q.         The day you set foot in HACC was 1998?
6         A.         Yes.
7         Q.         Do you know whether or not a rule
8 within your department would have been instituted in
9 1998 where you would have been unable to take classes
10 during the day?
11         A.         No, there was no rule.
12         Q.         At some point there was a rule?
13         A.         Yes.
14         Q.         Do you know whether that rule was
15 implemented before or after Mr. Hargis wrote this
16 e-mail to Meredith and George?
17         A.         This was after.
18         Q.         Do you know whether Mr. Hargis was
19 aware of the rule that was implemented in your
20 department?
21         A.         I explained to him the whole situation.
22         Q.         Do you know whether or not this e-mail
23 was ever communicated to Barbara Hutchinson?
24         A.         I do not know.
25         Q.         Can you we agree that the rule was

126

1 never changed subsequent to this e-mail?
2         A.         Correct.
3                 MS. O'DONNELL:  That is all I have.
4
5                 (At this time Deposition
6                 Exhibit Nos. 26 to 55 were
7                 marked for identification.)
8
9                 (At this time the deposition in
10                 the above-captioned case was
11                 concluded.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

C E R T I F I C A T E


     I do hereby certify that before the
taking of his/her deposition the said witness was
by me first duly sworn to testify the truth, the
whole truth and nothing but the truth and that the
above deposition was recorded in stenotype by me
and reduced to typewriting under my supervision.


Suzanne Minello-Devine
Notary Public